HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
MICHAEL D. WEINSTEIN (Bar No. 262179)
E-Mail: Michael_Weinstein@fd.org
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081
JELANI J. LINDSEY (Bar No. 280092)
E-Mail: Jelani_Lindsey@fd.org
Deputy Federal Public Defender
3801 University Ave., Ste. 700
Riverside, CA 92501
Telephone: (951) 276-6346
Facsimile: (951) 276-6368

Attorneys for Petitioner
JAMES P. ANDERSON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| JAMES P. ANDERSON,<br><br>                    Petitioner,<br><br>          v.<br><br>KEVIN CHAPPELL, Warden,<br>California State Prison at San Quentin,<br><br>                    Respondent. | NO. CV 03-07948-JLS<br><br>**DEATH PENALTY CASE**<br><br>**PETITIONER'S REPLY TO RESPONDENT'S OPPOSITION BRIEF ADDRESSING THE MERITS OF PETITIONER'S CLAIMS** |

# **TABLE OF CONTENTS**

**PAGE**

I.  INTRODUCTION ...................................................................................... 1

II. GENERAL REPLY ..................................................................................... 2

    A.  Anderson's brief addresses only the merits of his claims........................ 2

    B.  Despite what Respondent asserts, *Brecht v. Abrahamson* does not apply to each of Anderson's claims. ......................................... 2

    C.  For those claims that are subject to a harmlessness inquiry, Anderson does not need to satisfy *Brecht* and also demonstrate that the state court's prejudice determination was unreasonable under 28 U.S.C. § 2254(d). ...................................................................... 3

    D.  Despite what Respondent asserts, Anderson does not have to base each claim on clearly established federal law. ........................... 4

    E.  Respondent does not challenge Anderson's argument that 28 U.S.C. § 2254(d) does not bar relief on Anderson's extra-record claims because the California Supreme Court failed to follow its special procedures for resolving habeas cases. ........................................ 7

    F.  This Court should deem Respondent's failure to address material points to be a concession that Anderson prevails on that point or a waiver of any contrary argument. ....................................... 8

III. CLAIMS ARISING FROM ANDERSON'S 1979 GUILT TRIAL ..................... 9

    A.  This Court should grant relief on Anderson's *Bruton* claim (Claim Two). ................................................................................. 9

    B.  This Court should grant relief because the trial court failed to exclude "other crimes" evidence about Anderson allegedly pimping Sheila (Claim Twelve). .................................................................. 15

    C.  This Court should grant habeas relief based on the trial court's failure to exclude "other crimes" evidence of an unconsummated gas station robbery (Claim Thirteen). ................................................. 17

    D.  This Court should grant habeas relief because the trial court refused to grant Anderson's request for a change of venue (Claim Three)............ 19

    E.  This Court should grant habeas relief because the jury saw Anderson shackled at trial (Claim Eight). ................................................ 20

    F.  This Court should grant habeas relief because the trial court erroneously admitted prejudicial crime-scene photographs (Claim Eleven). ................................................................................. 21

    G.  This Court should grant habeas relief because the trial court failed to properly instruct the jury (Claim Fifteen (A)). .......................... 22

    H.  This Court should grant habeas relief because the jury's verdict is based on false and unreliable evidence (Claim Nine)........................ 25

i

# TABLE OF CONTENTS

**PAGE**

1.    This Court should grant relief on Anderson's *Napue* claim...........25

2.    This Court should grant relief on Anderson's separate due process claim...................................................................................26

I.    This Court should grant habeas relief because Michael Lewis was ineffective.....................................................................................27

    1.    Governing standards ......................................................27

    2.    Lewis was ineffective for failing to adequately investigate and present mental health evidence at guilt (Claim One.B.2)..............27

        a.    Lewis was deficient. ............................................28

        b.    Lewis could have presented evidence that Anderson was brain damaged and suffered from a serious mental illness, and there is a reasonable probability that this evidence would have affected the result of this case............................32

    3.    Lewis was ineffective for not adequately moving to exclude Anderson's pretrial statements (Claim One.B.3)............................35

    4.    Lewis was ineffective because he inadequately advised Anderson about the implications of testifying and failed to minimize the damage caused by Anderson's pretrial statements (Claim One.B.4)..................................................................36

J.    This Court should grant habeas relief because the 987 judge violated California Penal Code section 987 (Claim Four)...................................38

K.    This Court should grant habeas relief because Anderson was incompetent at trial (Claim Five). ...............................................40

L.    This Court should grant habeas relief because the trial court failed to conduct sequestered voir dire (Claim Six)................................41

M.    This Court should grant habeas relief because the trial court erroneously excluded potential jurors in violation of *Witherspoon v. Illinois* (Claim Seven). ...............................................42

N.    This Court should grant habeas relief because the prosecutor violated *Brady v. Maryland* by not turning over exculpatory evidence (Claim Ten). ...................................................................................44

    1.    Either the prosecutor never turned over the results of Fred's polygraph test or the prosecutor never administered the test. Under either scenario, the prosecutor committed egregious misconduct that undermines the fairness of Anderson's trial and the reliability of his convictions. ...................................44

    2.    Anderson has established a *Brady* violation...................................46

O.    This Court should grant habeas relief on Anderson's *Ake* claim (Claim Fourteen). ...................................................................................47

# TABLE OF CONTENTS

**PAGE**

P.   This Court should grant habeas relief because the California Supreme Court arbitrarily deprived Anderson of an instruction it routinely provided to other similarly-situated capital defendants (Claim Fifteen(B))......................................................................................48

Q.   This Court should grant habeas relief on Anderson's remaining ineffectiveness claims (Claim One.C). ......................................................50

   1.   Governing standards ........................................................................50

   2.   Lewis was ineffective. ......................................................................51

R.   This Court should grant habeas relief on Anderson's cumulative error claim (Claim Thirty-Eight). .........................................................52

IV.   CLAIMS ARISING FROM ANDERSON'S 1990-91 PENALTY RETRIAL ...53

A.   This Court should grant relief on Anderson's ineffectiveness claims (Claim Sixteen). ......................................................................53

   1.   This Court should grant relief because Keith Long was ineffective in investigating and presenting mitigating evidence. ....53

      a.   Deficient performance ...........................................................53

         (1)   Long's social-history investigation fell below professional standards. ..................................................53

         (2)   Long's mental health investigation also fell short of professional standards. .................................................56

         (3)   Long's decision to pursue a lingering doubt defense is indefensible...............................................................58

         (4)   Anderson details Long's chronic alcoholism and depression because it offers a partial explanation about what went wrong during this trial. ...................59

      b.   Anderson was prejudiced by Long's failures......................60

   2.   Anderson was prejudiced by Long's failure to raise a *Batson/Wheeler* challenge (Claim Nineteen). .................................63

   3.   Anderson was prejudiced by Long's failure to seek the appointment of *Keenan* counsel after the trial court removed Kennedy from the case (Claim Seventeen). ....................................64

   4.   Anderson was prejudiced by Long's inexplicable failure to use his peremptory challenges on obviously biased jurors (Claim Eighteen). .........................................................................66

B.   This Court should grant relief because the trial court denied Anderson his right to be present at a critical stage of the proceedings—the ex parte removal of one of his lawyers (Claims Twenty-Three)..................67

iii

# TABLE OF CONTENTS

PAGE

C.    The trial court's erroneous decision to allow Baros to testify violated Anderson's constitutional rights (Claim Twenty-Eight). ......................... 69

D.    This Court should grant relief because the trial court prevented Anderson from calling witnesses in his defense (Claim Thirty). ............. 71

E.    This Court should grant relief because Anderson's sentence is based on false and unreliable evidence (Claim Twenty-Nine). ......................... 73

F.    The trial court committed a constitutional error when it failed to *sua sponte* instruct the jury on the elements of the unadjudicated Jack Mackey offenses (Thirty-Six). ................................................................. 74

G.    The trial court's failure to provide the requested jury instruction regarding the weight of aggravating and mitigating circumstances renders Anderson's sentence unconstitutional (Claim Thirty-Five).......... 75

H.    The consideration of extrinsic evidence by jurors during deliberations constitutes juror misconduct (Claim Twenty-Six)...................................... 75

I.    Other instances of ineffectiveness warrant habeas relief (Claims Twenty and Twenty-One). ................................................................. 76

J.    Race unconstitutionally motivated the prosecutor's charging decision (Claim Twenty-Two). ................................................................. 77

K.    This Court should grant relief because Anderson was incompetent during the trial (Claim Twenty-Four). ............................................. 78

L.    This Court should grant relief because the State unconstitutionally excluded minorities from the jury pool (Claim Twenty-Five). ................ 78

M.    This Court should grant habeas relief because Anderson and his attorney were not present at a proceeding where the trial court took evidence to determine whether Anderson should be shackled, and also because Anderson was shackled (Claim Twenty-Seven). ........................ 79

N.    The jury's consideration of the unadjudicated Jack Mackey offenses violated Anderson's constitutional rights (Claim Thirty-One)................. 81

O.    This Court should grant relief on Anderson's *Brady* claim (Claim Thirty-Two). ......................................................................... 81

P.    This Court should grant relief because the trial court erroneously admitted prejudicial photographs (Claim Thirty-Three). ....................... 81

Q.    This Court should grant relief on Anderson's *Ake* claim (Claim Thirty-Four). ......................................................................... 81

R.    Anderson has shown that multiple instructional errors at penalty entitle him to habeas relief (Claim Thirty-Seven). ................................. 82

S.    This Court should grant habeas relief on Anderson's cumulative error claim (Claim Thirty-Eight). .................................................... 83

iv

# TABLE OF CONTENTS

**PAGE**

T.   This Court should grant relief on Anderson's systemic challenges to the death penalty (Claim Thirty-Seven)......................................................84

V.   CONCLUSION ...................................................................................85

v

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*Adams v. Texas*,
    448 U.S. 38 (1980)........................................................................... 44

*Ake v. Oklahoma*,
    470 U.S. 68 (1985)................................................................. 48, 82, 83

*Alcala v. Woodford*,
    334 F.3d 862 (9th Cir. 2003) ..................................... 15, 16, 18

*Allen v. Woodford*,
    395 F.3d 979 (9th Cir. 2004) ................................................. 65

*Apprendi v. New Jersey*,
    530 U.S. 466 (2000).......................................................... 84

*Atkins v. Virginia*,
    536 U.S. 304 (2002)............................................................ 8

*Bates v. United States*,
    522 U.S. 23 (1997)............................................................ 6

*Batson v. Kentucky*,
    476 U.S. 79 (1986).................................................... 1, 3, 5, 63

*Bayramoglu v. Estelle*,
    806 F.2d 880 (9th Cir. 1986) ................................................ 76

*Beames v. Chappell*,
    No. 10-CV-01429-AWI, 2013 WL 5754938 (E.D. Cal. Oct. 23, 2013).................... 7

*Bean v. Calderon*,
    163 F.3d 1073 (9th Cir.1998) .......................................... 55, 57

*Bemore v. Chappell*,
    788 F.3d 1151 (9th Cir. 2015) ........................................ 59, 60

*Bland v. California Dept. of Corrections*,
    20 F.3d 1469 (9th Cir. 1994) ..........................................*passim*

*Borrero v. Fleming*,
    143 F. App'x 774 (9th Cir. 2005) (unpublished) ...................................... 17

vi

## TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*Boyde v. Brown,*
    404 F.3d 1159 (9th Cir. 2005) ................................................................. 51

*Boyer v. Belleque,*
    659 F.3d 957 (9th Cir. 2011) .................................................................. 25

*Bradley v. Henry,*
    428 F.3d 811 (9th Cir. 2005) .................................................................. 69

*Bradshaw v. Ritchey,*
    546 U.S. 74 (2005) ................................................................................. 38

*Brady v. Maryland,*
    373 U.S. 83 (1963) ..........................................................................*passim*

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993) ........................................................................*passim*

*Brumfield v. Cain,*
    135 S. Ct. 2269 (2015) ................................................................. 7, 8, 24

*Bruton v. United States,*
    391 U.S. 123 (1968) ........................................................................*passim*

*Cadwell v. Mississippi,*
    472 U.S. 320 (1985) ............................................................................. 76

*California v. Trombetta,*
    467 U.S. 479 (1984) ............................................................................. 24

*Cannedy v. Adams,*
    706 F.3d 1148 (9th Cir. 2013) .................................................................. 8

*Carey v. Musladin,*
    549 U.S. 70 (2006) ............................................................................... 39

*Carlson v. Jess,*
    526 F.3d 1018 (7th Cir. 2008) .................................................................. 6

*Caro v. Calderon,*
    165 F.3d 1223 (9th Cir. 1999) ................................................... 29, 55, 56

## TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*Caro v. Woodford*,
  280 F.3d 1247 (9th Cir. 2002) ................................................................. 29, 55

*Carrera v. Ayers*,
  670 F.3d 938 (9th Cir. 2011) ................................................................. 66, 67

*Carrera v. Ayers*,
  699 F.3d 1104 (9th Cir. 2012) .................................................................. 64

*Carter v. Rafferty*,
  826 F.2d 1299 (3d Cir. 1987) .................................................................. 46

*Chambers v. Mississippi*,
  410 U.S. 284 (1973) ....................................................................52, 53, 72, 84

*Chapman v. California*,
  386 U.S. 18 (1967) .................................................................................. 3, 80

*Chapman v. United States*,
  500 U.S. 453 (1991) ................................................................................. 49

*Clabourne v. Lewis*,
  64 F.3d 1373 (9th Cir. 1995) .................................................................. 29

*Cone v. Bell*,
  556 U.S. 449 (2009) .........................................................................*passim*

*Cudjo v. Ayers*,
  698 F.3d 752 (9th Cir. 2012) .................................................................. 72

*Daniels v. Woodford*,
  428 F.3d 1181 (9th Cir. 2005) ................................................................ 20

*Davis v. Ayala*,
  135 S. Ct. 2187 (2015) ....................................................................3, 4, 6, 14

*Davis v. Grigas*,
  443 F.3d 1155 (9th Cir. 2006) ............................................................ 6, 18, 22

*Davis v.Woodford*,
  384 F.3d 628 (9th Cir. 2004) .................................................................. 66

# TABLE OF AUTHORITIES

**PAGE(S)**

1  **FEDERAL CASES**

*Day v. McDonough,*
  547 U.S. 198 (2006)...............................................................................9

*Deck v. Jenkins,*
  768 F.3d 1015 (9th Cir. 2014) ..............................................................4

*Deck v. Missouri,*
  544 U.S. 622 (2005).............................................................................21

*Delaware v. Van Arsdall,*
  475 U.S. 673 (1986)...........................................................10, 12, 13, 14

*Dillard v. Roe,*
  244 F.3d 758 (9th Cir. 2001) ....................................................17, 19, 22

*Doe v. Ayers,*
  782 F.3d 425 (9th Cir. 2015) .........................................................55, 64

*Dow v. Virga,*
  729 F.3d 1041 (9th Cir. 2013) .......................................................25, 26

*Drope v. Missouri,*
  420 U.S. 162 (1975).............................................................................40

*Duren v. Missouri,*
  439 U.S. 357 (1979).......................................................................79, 80

*Dusky v. United States,*
  362 U.S. 402 (1960).............................................................................40

*Estes v. State of Tex.,*
  381 U.S. 532 (1965).............................................................................20

*Estrada v. Scribner,*
  512 F.3d 1227 (9th Cir. 2008) .............................................................76

*Faretta v. California,*
  422 U.S. 806 (1975).............................................................................81

*Fetterly v. Paskett,*
  15 F.3d 1472 (9th Cir. 1994) ...............................................................39

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*Fetterly v. Paskett*,
997 F.2d 1295 (9th Cir. 1993) ...................................................................... 38

*Fields v. Brown*,
503 F.3d 755 (9th Cir. 2007) ....................................................................... 76

*Frantz v. Hazey*,
533 F.3d 724 (9th Cir. 2008) ............................................................. 5, 68, 81

*Frierson v. Woodford*,
463 F.3d 982 (9th Cir. 2006) .................................................................. 56, 57

*Fry v. Pliler*,
551 U.S. 112 (2007)................................................................................... 3, 4

*Godinez v. Moran*,
509 U.S. 389 (1993)...................................................................................... 40

*Gray v. Mississippi*,
481 U.S. 648 (1987)...................................................................................... 44

*Greenfield v. Scafati*,
277 F. Supp. 644 (D. Mass. 1967) ................................................................. 5

*Ham v. South Carolina*,
409 U.S. 524 (1973)................................................................................. 41, 42

*Hamilton v. Ayers*,
583 F.3d 1100 (9th Cir. 2000) ...................................................................... 58

*Harris v. Pulley*,
885 F.2d 1354 (9th Cir. 1988) ................................................................ 20, 31

*Harris v. Vasquez*,
949 F.2d 1497 (9th Cir. 1990) ................................................................ 30, 31

*Harris v. Wood*,
64 F.3d 1432 (9th Cir. 1995) ........................................................................ 51

*Hayes v. Brown*,
399 F.3d 972 (9th Cir. 2005) .......................................................................... 3

# TABLE OF AUTHORITIES

**PAGE(S)**

1

**FEDERAL CASES**

*Hicks v. Oklahoma*,
447 U.S. 343 (1980)................................................................38, 39, 49, 50

*Hinojosa v. Davey*,
803 F.3d 412 (9th Cir. 2015) ...............................................................*passim*

*Holbrook v. Flynn*,
475 U.S. 560 (1986)............................................................................... 21

*Holley v. Yarborough*,
568 F.3d 1091 (9th Cir. 2009) ...................................................... 15, 18, 72

*Irvin v. Dowd*,
366 U.S. 717 (1961)............................................................................... 42

*Jackson v. Brown*,
513 F.3d 1057 (9th Cir. 2008) ............................................................. 3, 47

*Jacobs v. Singletary*,
952 F.2d 1282 (11th Cir. 1992) ............................................................. 46

*Jammal v. Van de Kamp*,
926 F.2d 918 (9th Cir. 1991) ............................................................ 16, 18

*Johnson v. Mississippi*,
486 U.S. 578 (1988)......................................................................... 75, 81

*Johnson v. Williams*,
133 S. Ct. 1088 (2013)........................................................................... 38

*Jones v. United States*,
527 U.S. 373 (1999)............................................................................... 84

*Karis v. Calderon*,
283 F.3d 1117 (9th Cir. 2002) ................................................................ 58

*Kealohapauole v. Shimoda*,
800 F.2d 1463 (9th Cir. 1986) ................................................................ 22

*Kyles v. Whitley*,
514 U.S. 419 (1995)............................................................................ 3, 47

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*Lafler v. Cooper*,
  132 S. Ct. 1376 (2012)...........................................................................43

*Lambright v. Schriro*,
  490 F.3d 1103 (9th Cir. 2007) ............................................................58

*Lockett v. Ohio*,
  438 U.S. 586 (1978)...............................................................................84

*Lockyer v. Andrade*,
  538 U.S. 63 (2003) .................................................................................39

*Mancuso v. Olivarez*,
  292 F.3d 939 (9th Cir. 2002) ...............................................................77

*Matthews v. United States*,
  485 U.S. 58 (1988).................................................................................24

*Mays v. Clark*,
  No. 12-17189, 2015 WL 8117079 (9th Cir. Dec. 8, 2015) .........................4

*McKinney v. Rees*,
  993 F.2d 1378 (9th Cir. 1993) ....................................................15, 16, 18

*Miller-El v. Dretke*,
  545 U.S. 231 (2005)...............................................................................64

*Mills v. Maryland*,
  486 U.S. 376 (1988)...............................................................................83

*Miranda v. Arizona*,
  384 U.S. 436 (1966)...............................................................................36

*Montana v. Egelhoff*,
  518 U.S. 37 (1996)...........................................................................53, 84

*Mu'Min v. Virginia*,
  500 U.S. 415 (1991)...............................................................................42

*In re Murchison*,
  349 U.S. 133 (1955)...............................................................................40

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*Murphy v. Florida,*
   421 U.S. 794 (1975).............................................................. 20

*Musladin v. Lamarque,*
   555 F.3d 830 (9th Cir. 2009) ............................................. 80

*Myers v. Ylst,*
   897 F.2d 417 (9th Cir. 1990) ........................................ 49, 50

*Napue v. Illinois,*
   360 U.S. 264 (1959)...................................................*passim*

*Nevaraz v. Barnes,*
   749 F.3d 1124 (9th Cir. 2014) ............................................ 5

*Nunes v. Mueller,*
   350 F.3d 1045 (9th Cir. 2003) ............................................ 7

*O'Brien v. McEwen,*
   No. 14-15753, 2015 WL 5042920 (9th Cir. Aug. 27, 2015).................... 8

*Panetti v. Quarterman,*
   551 U.S. 930 (2007)..................................................... 39, 42

*Parker v. Duggar,*
   498 U.S. 308 (1991)......................................................... 83

*Parle v. Runnels,*
   505 F.3d 922 (9th Cir. 2007) ..................................... 52, 84, 85

*Payne v. Tennessee,*
   501 U.S. 808 (1991).................................................... 22, 82

*Penry v. Lynaugh,*
   492 U.S. 302 (1989)......................................................... 54

*Perry v. New Hampshire,*
   132 S. Ct. 716 (2012)................................................... 26, 27

*Pirtle v. Morgan,*
   313 F.3d 1160 (9th Cir. 2002) ..................................... 15, 68, 72

# TABLE OF AUTHORITIES

**PAGE(S)**

1

**FEDERAL CASES**

*Porter v. McCollum*,
558 U.S. 30 (2009) ................................................................ 17, 58, 62, 63

*Pulido v. Chrones*,
629 F.3d 1007 (9th Cir. 2010) ................................................................ 4

*Rankin v. Palmer*,
2015 WL 5638016 (9th Cir. Sept. 25, 2015) ........................................ 43

*Reynoso v. Giurbino*,
462 F.3d 1099 (9th Cir. 2006) ........................................................ 14, 17

*Rideau v. Louisiana*,
373 U.S. 723 (1963) ........................................................................ 19, 20

*Ring v. Arizona*,
536 U.S. 584 (2002) ............................................................................ 84

*Ristaino v. Ross*,
424 U.S. 589 (1976) ............................................................................ 42

*Rogers v. McDaniel*,
793 F.3d 1036 (9th Cir. 2015) ............................................................... 4

*Rompilla v. Beard*,
545 U.S. 374 (2005) ........................................................ 51, 56, 58, 62

*Rushen v. Spain*,
464 U.S. 114 (1983) ...................................................................... 68, 81

*Scott v. Ryan*,
686 F.3d 1130 (9th Cir. 2012) ....................................................... 66, 77

*Sheppard v. Maxwell*,
384 U.S. 333 (1966) ............................................................................ 19

*Silva v. Woodford*,
279 F.3d 825 (9th Cir. 2002) ............................................................... 58

*Snyder v. Massachusetts*,
291 U.S. 97 (1934) .................................................................... 68, 80, 81

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*Stankewitz v. Woodford*,
   365 F.3d 706 (9th Cir. 2004) .................................................................. 58

*Stanley v. Schriro*,
   598 F.3d 612 (9th Cir. 2010) .................................................................. 29

*Strickland v. Washington*,
   466 U.S. 668 (1984).................................................................*passim*

*Strickler v. Greene*,
   527 U.S. 263 (1999)................................................................... 46

*Sullivan v. Louisiana*,
   508 U.S. 275 (1993)............................................................... 75, 78

*Taylor v. Kentucky*,
   436 U.S. 478 (1978)............................................................... 53, 84

*Taylor v. Maddox*,
   366 F.3d 992 (9th Cir. 2004) .................................................................. 23

*Thaler v. Haynes*,
   559 U.S. 43 (2010)......................................................... 5, 6, 18, 22

*Tinsley v. Borg*,
   895 F.2d 520 (9th Cir. 1990) .................................................................. 66

*Tumey v. Ohio*,
   273 U.S. 510 (1927)........................................................... 38, 39, 40

*United States v. Armstrong*,
   517 U.S. 456 (1996)................................................................... 77

*United States v. Cronic*,
   466 U.S. 648 (1984)................................................................... 80

*United States v. Esquivel*,
   88 F.3d 722 (9th Cir. 1996) .................................................................. 79

*United States v. Ewing*,
   638 F.3d 1226 (9th Cir. 2011) .................................................................*passim*

xv

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*United States v. Gagnon*,
  470 U.S. 522 (1985)......................................................................... 80, 81

*United States. v. Gates*,
  10 F.3d 765 (11th Cir. 1993) ................................................................. 70

*United States v. Hernandez-Estrada*,
  749 F.3d 1154 (9th Cir. 2014) ............................................................... 79

*United States v. Lovasco*,
  431 U.S. 783 (1977).............................................................................. 27

*United States v. Rodriguez-Lara*,
  421 F.3d 932 (9th Cir. 2005) ................................................................. 79

*Villafuerte v. Lewis*,
  75 F.3d 1330 (9th Cir. 1996) ................................................................. 82

*Wallace v. Stewart*,
  184 F.3d 1112 (9th Cir. 1999) ............................................................... 29

*Wiggins v. Smith*,
  539 U.S. 510 (2003)......................................................................*passim*

*Williams v. Chappell*,
  00-CV-10637-DOC (C.D. Cal. Dec. 10, 2013).............................. 7, 31, 55

*Williams v. Taylor*,
  529 U.S. 362 (2000)...................................................................51, 53, 62

*Winzer v. Hall*,
  494 F.3d 1192 (9th Cir. 2007) ............................................................... 14

*Wood v. Bartholomew*,
  516 U.S. 1 (1995)................................................................................. 47

*Woodson v. North Carolina*,
  428 U.S. 280 (1976).............................................................................. 81

*Ybarra v. McDaniel*,
  656 F.3d 984 (9th Cir. 2011) ................................................................. 67

xvi

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*Zapien v. Martel*,
805 F.3d 862 (9th Cir. 2015) ............................................................. 8

**STATE CASES**

*Carlos v. Superior Court*,
35 Cal. 3d 131 (1983) ............................................................. 49, 50

*In re Fields*,
51 Cal. 3d 1063 (1990) ............................................................. 30, 31

*People v. Adams*,
53 Cal. App. 3d 109 (1975) ............................................................. 47, 52

*People v. Anderson* (*Anderson I*),
43 Cal. 3d 1104 (1987) ............................................................. *passim*

*People v. Anderson* (*Anderson II*),
25 Cal. 4th 543 (2001) ............................................................. *passim*

*People v. Beeman*,
35 Cal. 3d 547 (1984) ............................................................. 24

*People v. Carter*,
48 Cal. 2d 737 (1957) ............................................................. 47

*People v. Dailey*,
179 Cal. App. 2d 482 (1960) ............................................................. 23

*People v. Duvall*,
9 Cal. 4th 464 (1995) ............................................................. 7

*People v. Fuentes*,
40 Cal. 3d 629 (1985) ............................................................. 50

*People v. Garcia*,
36 Cal. 3d 539 (1984) ............................................................. 50

*People v. Guerra*,
40 Cal. 3d 377 (1985) ............................................................. 50

# TABLE OF AUTHORITIES

**PAGE(S)**

**STATE CASES**

*People v. Hamilton*,
  41 Cal. 3d 408 (1985) ........................................................................ 50

*People v. Hayes*,
  38 Cal. 3d 780 (1985) ........................................................................ 50

*People v. Ramos*,
  37 Cal. 3d 136 (1984) ........................................................................ 50

*People v. Ratliff*,
  41 Cal. 3d 675 (1986) ........................................................................ 50

*People v. Robinson*,
  61 Cal. 2d 373 (1964) ........................................................................ 23

*People v. Sapp*,
  31 Cal. 4th 240 (2003) ...................................................................... 47

*People v. Scott*,
  61 Cal. 4th 363 (2015) ...................................................................... 13

*People v. Silberston*,
  41 Cal. 3d 296 (1985) ........................................................................ 50

*People v. (Stephen) Anderson*,
  38 Cal. 3d 58 (1985) .......................................................................... 50

*People v. Thompson*,
  27 Cal. 3d 303 (1980) ........................................................................ 15

*People v. Turner*,
  37 Cal. 3d 302 (1984) ........................................................................ 50

*People v. Wheeler*,
  22 Cal. 3d 258 (1978) .................................................................. 63, 64

*People v. Whitt*,
  36 Cal. 3d 724 (1984) ........................................................................ 50

*People v. Williams*,
  44 Cal. 3d 883 (1988) .................................................................. 30, 31

xviii

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL STATUTES**

28 U.S.C § 2254(d) ............................................................................... *passim*

**STATE STATUTES**

Cal. Evid. Code § 352 ..................................................................................... 13

Cal. Penal Code § 987.9 .................................................................................. 38

California Evidence Code § 351.1 .................................................................. 47

California Evidence Code § 767 ..................................................................... 11

California Evidence Code § 970 ..................................................................... 72

California Penal Code § 987 .............................................................. 38, 39, 53

**MISCELLANEOUS**

CALJIC 2.01 ..................................................................................................... 83

Ex Parte, Black's Law Dictionary (10th ed. 2014) ....................................... 69

# I.  INTRODUCTION

Petitioner James Phillip Anderson's opening merits brief details the many constitutional violations that warrant habeas relief here.  (Dkt. 106, Pet. Opening Merits Br. (Pet. Br.).)  The errors run along the entire constitutional spectrum.  Some involve trial court error, like Anderson's claim that the admission of his co-defendant's extrajudicial statements at his 1979 trial violated *Bruton v. United States*, 391 U.S. 123 (1968).  Others involve prosecutorial misconduct, like Anderson's *Brady*[1] and *Batson*[2] claims.  Still others turn on trial counsel's failures, like Anderson's claim that trial counsel from his 1979 trial failed to investigate mental health defenses.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  Anderson's trial counsel from his 1990-91 penalty retrial also was ineffective in his investigation and presentation of mitigation evidence.  *Id.*

Respondent's opposition makes an unconvincing case for affirming Anderson's convictions and death sentence.  (Dkt. 112, Resp. Opp. Br. (Resp. Br.).)  To the extent Respondent addresses Anderson's brief, he largely repeats arguments from his Answer, which are the same arguments Anderson preemptively addressed in his opening brief.  Respondent, however, also ignores many arguments that Anderson developed in his opening merits brief.  Respondent's failure to dispute Anderson's factual allegations and legal arguments constitutes waiver.  *United States v. Ewing*, 638 F.3d 1226, 1230 (9th Cir. 2011) (the government's "failure to brief the issue results in waiver"); *Bland v. California Dept. of Corrections*, 20 F.3d 1469, 1474 (9th Cir. 1994) *overruled on unrelated grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) ("To the extent the State had a dispute with the facts as stated in the decision of Court of Appeal, it should have raised it in the district court.").

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] *Batson v. Kentucky*, 476 U.S. 79 (1986).

1    This reply brief further demonstrates what Anderson has already established:  28

2    U.S.C. § 2254(d) does not bar relief on any of his claims and, under de novo review,

3    Anderson is entitled to habeas relief.  Accordingly, Anderson respectfully requests that

4    this Court grant the writ.

## II.  GENERAL REPLY

6        Preliminarily, it is important to address a few recurring issues raised by

7    Respondent's opposition.

## A.    Anderson's brief addresses only the merits of his claims.

9        Although this Court directed the parties to submit briefing "addressing only the

10   merits" of Anderson's claims, and "not addressing any procedural default issues" (dkt.

11   102, Order Revising Scheduling Order for Briefs), Respondent appears to raise the

12   specter of procedural default in the "background section" of each claim.  (*See, e.g.*,

13   Resp. Br. at 32 ("The CSC summarily denied this claim on the merits, and as

14   procedurally barred because it could have been raised on direct appeal.").)  Anderson

15   does not engage with Respondent on the procedural default issue, and instead, in line

16   with this Court's prior order, addresses only Respondent's arguments about the merits

17   of Anderson's claims.  Should this Court require briefing on any procedural default

18   issue, Anderson is prepared to demonstrate why none of his claims is procedurally

19   defaulted.

## B.    Despite what Respondent asserts, *Brecht v. Abrahamson* does not apply to each of Anderson's claims.

22       As Anderson acknowledges in his opening brief, habeas relief is usually

23   warranted only if the alleged constitutional error had a "substantial and injurious effect

24   or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619,

25   637 (1993) (internal quotation marks omitted).  As evident by Respondent's constant

26   reference to *Brecht* in his analysis of each of Anderson's claims, Respondent assumes

27   that virtually all federal habeas claims are subject to a *Brecht* analysis.  He's incorrect.

28   "[C]ertain types of claims are analyzed under their own harmless error standards, which

2

can render *Brecht* analysis unnecessary." *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008) (citing *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (noting that *Brecht* analysis is unnecessary for *Brady* claims made on habeas); *Hayes v. Brown*, 399 F.3d 972, 984-85 (9th Cir. 2005) (en banc) (same for *Napue* claims)).  Also, some claims, like Anderson's competency claims (Claims Five & Twenty-Four), jury selection claims (Claims Six, Seven, and Twenty-Five), and *Batson* claim (Claim Nineteen), are structural error claims, which means they are not subject to *Brecht*, or any prejudice analysis, either.  *See Brecht*, 507 U.S. at 629 (explaining that "structural defects in the constitution of the trial mechanism . . . defy analysis by 'harmless-error' standard").

**C.**   **For those claims that are subject to a harmlessness inquiry, Anderson does not need to satisfy *Brecht* and also demonstrate that the state court's prejudice determination was unreasonable under 28 U.S.C. § 2254(d).**

Though it may appear that the parties are proposing different standards of review for a harmlessness prejudice inquiry, they are not.  Respondent cites *Davis v. Ayala*, 135 S. Ct. 2187 (2015), a case the United States Supreme Court decided a few weeks after Anderson filed his opening merits brief, for the proposition that Anderson is not entitled to habeas relief unless he can demonstrate that the California Supreme Court unreasonably applied *Chapman v. California*, 386 U.S. 18 (1967).  (Resp. Br. at 7.) Anderson, by comparison, analyzes his *Bruton* claim in his opening brief under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

Although the parties cite different cases, the prejudice standards they employ are the same.  In *Fry v. Pliler*, 551 U.S. 112, 120 (2007), the Supreme Court explained that a petitioner did not need to demonstrate both that an error had a substantial and injurious effect on a jury's verdict (i.e., *Brecht* prejudice) and that the state court's *Chapman* analysis was unreasonable (i.e., unreasonableness under § 2254(d)) because the *Brecht* standard "obviously subsumes" the § 2254(d)/*Chapman* standard.  *Id.* Following *Fry*, the Ninth Circuit has repeatedly declined to apply both tests in a

3

prejudice analysis, finding the two analyses to be duplicative of each other.  *See, e.g.*, *Deck v. Jenkins*, 768 F.3d 1015, 1022 (9th Cir. 2014) (citing *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010) (citing *Fry*, 551 U.S. at 120)).  Indeed they are.  As Justice Sotomayor explained in *Ayala*, "If a trial error is prejudicial under *Brecht*'s standard, a state court's determination that the error was harmless beyond a reasonable doubt is necessarily unreasonable."  *Ayala*, 135 S. Ct. at 2211 (Sotomayor, J., dissenting); *see also id.* at 2199 (majority opinion citing *Fry* with approval); *Mays v. Clark*, No. 12-17189, 2015 WL 8117079, at *10 (9th Cir. Dec. 8, 2015) (published) ("A determination that the error resulted in 'actual prejudice, *Brecht,* 507 U.S. at 637, necessarily means that the state court's harmlessness determination was not merely incorrect, but objectively unreasonable, *Davis*, 135 S. Ct. at 2198-99.").

Anderson does not therefore have to demonstrate both that he satisfies *Brecht* and that the state court's prejudice determination was unreasonable; demonstrating one will do.  Indeed, post-*Ayala*, the Ninth Circuit has continued to decline to require petitioners to demonstrate both.  *See, e.g.*, *Mays*, 2015 WL 8117079, at *10 ("A separate AEDPA/*Chapman* determination is not required."); *Rogers v. McDaniel*, 793 F.3d 1036, 1043 (9th Cir. 2015) (noting the *Ayala* decision, but analyzing prejudice under *Brecht*).

**D.    Despite what Respondent asserts, Anderson does not have to base each claim on clearly established federal law.**

Repeatedly, Respondent argues that Anderson cannot obtain relief on various claims because there is no clearly established federal law to support the claim.  (*See, e.g.*, Resp. Br. at 13-14 ("Anderson has pointed to no controlling Supreme Court precedent which was violated by the state court evidentiary rulings. . . . Therefore . . . admission of testimony of Sheila's statements regarding prostitution . . . could not have been contrary to, or an unreasonable application of, clearly established federal law."); *see also id.* at 16-17, 26-27, 48, & 114.)  There are, however, two situations when § 2254(d)(1)'s clearly established federal law

4

1    requirement does not restrict Anderson's ability to obtain habeas relief.  In these
2    situations, Anderson can base his claim on circuit precedent.

3         First, § 2254(d)(1)'s clearly established federal law requirement does not apply
4    when this Court reviews a claim de novo.  The Ninth Circuit held as much almost a
5    decade ago in *Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc) (explaining
6    that § 2254(d)(1)'s "limitations" are no "obstacle to the grant of habeas relief" when a
7    claim is reviewed de novo under § 2254(a)).  Recently, the Court reiterated this
8    principle in *Hinojosa v. Davey*, 803 F.3d 412 (9th Cir. 2015).  In that case, the state
9    court "did not decide Hinojosa's ex post facto claim on the merits."  *Id.* at 419.  It
10   denied the claim on a procedural ground, which meant § 2254(d) did not apply.  *Id.*; *see*
11   *also Cone v. Bell*, 556 U.S. 449, 472 (2009).  In granting habeas relief, the Ninth
12   Circuit based its decision on *Greenfield v. Scafati*, 277 F. Supp. 644, 644-45 (D. Mass.
13   1967), a decision by a three judge-panel from the District of Massachusetts that the
14   Ninth Circuit had adopted as "binding circuit precedent."  *Hinojosa*, 803 F.3d at 421
15   n.6.  As such, the Court continued, it was "bound by *Greenfield* here, notwithstanding
16   [its] holding in *Nevarez v. Barnes* that *Greenfield* "does not qualify as 'clearly
17   established federal law [as determined by the Supreme Court of the United States]' for
18   purposes of AEDPA."  *Id.* (quoting *Nevaraz v. Barnes*, 749 F.3d 1124, 1129 (9th Cir.
19   2014)).

20        Second, even when § 2254(d) applies to a claim, that claim can still be based on
21   circuit law if a petitioner is trying to establish that the relevant state-court decision was
22   based on an unreasonable determination of the facts.  The United States Supreme Court
23   made this clear in *Thaler v. Haynes*, 559 U.S. 43 (2010) (per curiam).  In that case, the
24   Court first analyzed whether any of its decisions clearly established "that a judge in
25   ruling on an objection to a peremptory challenge under *Batson*[, 476 U.S. 79], must
26   reject a demeanor-based explanation for the challenge unless the judge personally
27   observed and recalls the aspect of the prospective juror's demeanor on which the
28   explanation is based."  *Thaler*, 559 U.S. at 44.  After determining that it had never

1 clearly established such a rule, the Court observed that the petitioner could not satisfy

2 § 2254(d)(1). *Id.* at 49. Nevertheless, even in the absence of clearly established federal

3 law, the Court remanded the case to the Court of Appeals to determine whether the

4 state court's determination could be overcome under § 2254(d)(2). *Id.*

5      The outcome in *Thaler* is similar to the outcome in *Davis v. Grigas*, 443 F.3d

6 1155, 1158-59 (9th Cir. 2006), a non-capital habeas case where the Ninth Circuit found

7 there was no clearly established federal law to support the petitioner's claim of

8 ineffective assistance at a non-capital sentencing, but remanded for an analysis under

9 § 2254(d)(2). *See also Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008)

10 (explaining that "[b]ecause the trial court based its decision on an unreasonable factual

11 determination, the substantive merits of Carlson's claim are analyzed under the pre-

12 AEDPA standard-that is, *de novo*-because there is no state court analysis to apply

13 AEDPA standards to," and analyzing the federal habeas claim under Seventh Circuit

14 precedent).

15      *Hinojosa*, *Thaler*, *Davis*, and *Carlson* give full effect to AEDPA's statutory

16 language. AEDPA's "clearly established federal law" requirement is found only in

17 § 2254(d)(1). There is not similar language in § 2254(a), which prohibits federal

18 judges from granting habeas relief unless the petitioner demonstrates "that he is in

19 custody in violation of the Constitution or laws or treaties of the United States." Nor is

20 there similar language in § 2254(d)(2), which prohibits federal judges from granting

21 habeas relief on a claim that was "adjudicated on the merits" unless the adjudication of

22 the claim "resulted in a decision that was based on an unreasonable determination of

23 the facts in light of the evidence presented in the State court proceeding." "'[W]here

24 Congress includes particular language in one section of a statute but omits it in another

25 section of the same Act, it is generally presumed that Congress acts intentionally and

26 purposely in the disparate inclusion or exclusion.'" *Bates v. United States*, 522 U.S. 23,

27 29-30 (1997).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E.**    **Respondent does not challenge Anderson's argument that 28 U.S.C.**
**§ 2254(d) does not bar relief on Anderson's extra-record claims because**
**the California Supreme Court failed to follow its special procedures for**
**resolving habeas cases.**

In his opening brief, Anderson argues that he can overcome § 2254(d)'s limitations on his extra-record claims because the California Supreme Court failed to follow its special procedures for resolving habeas cases. Those procedures required the court to issue an order to show cause if Anderson made out a prima facie case for relief. *See People v. Duvall*, 9 Cal. 4th 464, 475 (1995) (explaining California's habeas procedures). As explained in Anderson's opening brief, the California Supreme Court's summary denials of Anderson's extra-record claims signal its determination that Anderson had not made out a prima facie case for relief on those claims. (*See* Pet. Br. at 84.) That finding is, however, unreasonable because Anderson's allegations, which the court was required to take at face value, and his supporting exhibits established, at the very least, a prima facie case for relief. (*Id.*)

*Nunes v. Mueller*, 350 F.3d 1045, 1054-55 (9th Cir. 2003), cited by Anderson in his brief, directly supports his position. So do two district court cases. (Pet. Br. at 84 (citing *Williams v. Chappell*, 00-CV-10637-DOC, at 30 (C.D. Cal. Dec. 10, 2013) ("Given these allegations setting forth a prima facie claim, it was unreasonable for the California Supreme Court to summarily deny this subclaim."); *Beames v. Chappell*, No. 10-CV-01429-AWI, 2013 WL 5754938, *12 (E.D. Cal. Oct. 23, 2013) (finding that the state court's denial of a claim stating a prima facie case, without the issuance of an order to show cause or further factual development, was unreasonable)).)

Since Anderson filed his opening brief, the Supreme Court and Ninth Circuit have decided two cases that further support Anderson's position. In *Brumfield v. Cain*, 135 S. Ct. 2269 (June 18, 2015), the Supreme Court held that the state court's refusal to

7

grant an *Atkins*[3] hearing was unreasonable under § 2254(d)(2) because "[t]he record before the state court contained sufficient evidence to raise a question as to whether Brumfield met" his burden under state law to obtain a hearing.  135 S. Ct. at 2279.  And in a recent unpublished decision, the Ninth Circuit found that § 2254(d) did not bar relief on the petitioner's ineffectiveness claims because the California state court failed to issue an order to show cause after the petitioner made out a prima facie case for relief.  *See O'Brien v. McEwen*, No. 14-15753, 2015 WL 5042920, at *1 (9th Cir. Aug. 27, 2015), *as amended* (Oct. 28, 2015) (citing *Cannedy v. Adams*, 706 F.3d 1148, 1160 (9th Cir. 2013)).  As in *Brumfield* and *O'Brien*, the state court here unreasonably denied Anderson's habeas claims without issuing an order to show cause and affording him the opportunity to develop the record for the purpose of proving his claims.

**F.    This Court should deem Respondent's failure to address material points to be a concession that Anderson prevails on that point or a waiver of any contrary argument.**

As noted in the introduction to this brief, throughout his opposition Respondent fails to address key issues central to the resolution of certain claims.  As noted in the discussion of claims below, this Court should find that Respondent's failure to brief an issue constitutes either a tacit concession that this Court should resolve that issue in Anderson's favor, or a waiver of any countervailing argument.  *See Ewing*, 638 F.3d at 1230 (the government's "failure to brief the issue results in waiver"); *Bland*, 20 F.3d at 1474 ("To the extent the State had a dispute with the facts as stated in the decision of Court of Appeal, it should have raised it in the district court.").

Significantly, in recent months the Ninth Circuit has declined to raise arguments for the State that the State should have raised for itself.  *See, e.g.*, *Zapien v. Martel*, 805 F.3d 862, 869 n.3 (9th Cir. 2015) (noting that the claim should be procedurally

---

    [3] *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that the execution of mentally retarded individuals is "cruel and unusual punishment").

8

1    defaulted, but declining to raise a procedural default defense for the State when the

2    State failed to do so on appeal and in district court); *Hinojosa*, 803 F.3d at 419-20

3    ("And although we may raise procedural default *sua sponte*, we decline to do so

4    here. . . .  We will not make the state's arguments for it, even only to rebut them.")

5    (internal citation omitted); *see also Day v. McDonough*, 547 U.S. 198, 210 (2006) ("If,

6    as this Court has held, '[d]istrict judges have no obligation to act as counsel or

7    paralegal to *pro se* litigants,' then, by the same token, they surely have no obligation to

8    assist attorneys representing the State.") (internal citation omitted).

9    **III.  CLAIMS ARISING FROM ANDERSON'S 1979 GUILT TRIAL**

10   **A.    This Court should grant relief on Anderson's *Bruton* claim (Claim**

11   **Two).**

12           While many errors occurred at Anderson's 1979 trial, perhaps the most egregious

13   and troubling one concerns the admission of the extrajudicial statements of Anderson's

14   co-defendant, Sheila Anders.  Through her experts' testimony, the jury heard that

15   Sheila told her experts she saw Anderson kill Louise Flanagan, that Anderson

16   essentially confessed to her that he killed Donna Coselman, and that she lied to the

17   police when she told them her brother Fred killed those women because it was

18   Anderson who committed the murders.  *People v. Anderson* (*Anderson I*), 43 Cal. 3d

19   1104, 1122 (1987).  Because Sheila never took the stand, Anderson never had an

20   opportunity to confront or cross-examine her about those statements.

21           The California Supreme Court described those statements as "powerfully

22   incriminating," "the type of 'evidence against a defendant . . . which [jurors] 'cannot

23   put out of their minds." *Anderson I,* 43 Cal. 3d at 1120, 1122.  That characterization

24   was manifestly correct, as was the court's holding that the introduction of these

25   statements violated *Bruton*, 391 U.S. 123.  *Anderson I*, 43 Cal. 3d at 1122.  Respondent

26   does not argue otherwise.  (*See* Resp. Br. at 6 ("There is no dispute that the CSC held

27   that Sheila's statements to her mental health professionals fell within the *Bruton*

28   rule.").)

9

1    Given Respondent's express concession that the California Supreme Court held

2  that *Bruton* error occurred here, the only remaining question for this Court is whether

3  this error prejudiced Anderson.  Both parties agree that, in conducting this analysis, this

4  Court should analyze prejudice using the five factors articulated by the Supreme Court

5  in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).  (Pet. Br. at 22; Resp. Br. at 6.)

6    The first factor—"the overall strength of the prosecution's case"—weighs

7  strongly in Anderson's favor.  Throughout his brief, Respondent repeatedly argues that

8  the prosecution's case was "overwhelming."  (*See, e.g.*, Resp. Br. at 9, 26, 28, 35, 51.)

9  This purportedly overwhelming evidence consists exclusively of Fred's testimony,

10  which Respondent asserts was "corroborated by physical evidence, notably the

11  presence near the victims' bodies of shoe prints matching the shoes worn by Sheila and

12  Anderson, as well as Sheila having Flanagan's purse and watch and Sheila's purse

13  containing Coselman's wallet."  (*Id.* at 10 (citing *Anderson I*, 43 Cal. 3d at 1129).)  But

14  a closer look at the prosecution's evidence reveals the weakness of its case.

15    To begin with, Respondent describes Fred's testimony as "internally consistent."

16  (*Id.*)  While this may be a fair characterization of Fred's direct testimony, his testimony

17  began to unravel when subjected to cross-examination.  As explained in Anderson's

18  opening brief (Pet. Br. at 22-25, 63-65), several portions of Fred's testimony did not

19  make sense.  For example, if, as Fred testified on cross, he really wanted to "help

20  [Coselman] get away" (Tr1 RT 112), then why did he not shepherd her out of the

21  orange grove after Anderson allegedly left him alone with her so that he (Anderson)

22  could retrieve Flanagan?  There was a forty-five minute time period when he could

23  have helped her escape, or when he could have left her in the grove and gone for help.

24  (Tr1 RT 111.)  But instead he waited for Anderson to return, even though, by Fred's

25  own admission, he was scared of Anderson.  (Tr1 RT 104, 232.)  Moreover, Fred's

26  testimony that Coselman gave him her phone number, presumably for a date, after he

27  played a role in her kidnapping is simply unbelievable.  (Tr1 RT 112-13.)

28

10

1       Equally significant, if not more so, Fred's testimony at trial was contradicted by

2  statements he made during investigative interviews or while under oath at the

3  preliminary hearing.  (*See* Pet. Br. at 23-24.)  The long list of inconsistencies is detailed

4  in Anderson's opening brief.  (*Id.*)  Other aspects of Fred's testimony also undercut his

5  credibility.  He made no attempt to hide his bias; he was friendly with the prosecution

6  on direct, but hostile and evasive toward defense counsel on cross.  (*See* Pet. Br. at 25;

7  *see also id.* (listing over 100 instances where Fred may have feigned memory loss).)

8  Fred also displayed a remarkable lack of knowledge about basic facts.  For example,

9  Fred did not know whether his sister was four or fourteen years older than he was,

10  whether he had been offered immunity for his testimony, or whether he had testified

11  before.  (Tr1 RT 80-81, 96, 242; *see also* Pet. Br. at 22-23 (listing basic facts Fred

12  could not recall).)  The prosecutor was so troubled by Fred's inability to answer

13  questions that he moved to ask Fred leading questions on direct because he thought

14  Fred was "clearly handicapped."  (Tr1 RT 96, 98 (citing California Evidence Code

15  section 767, which allows parties to ask leading questions on direct under very limited

16  circumstances).)  That mental handicap might explain why Fred, on multiple occasions,

17  asked the examining attorneys to repeat their questions to him.  (*See, e.g.*, Tr1 80, 81,

18  81-82, 82, 83, 84, 85, 89, 91, 94, 96, 100, 101, 102, 109, 117, 118, 127.)

19       Furthermore, there was evidence that raised a serious question about whether

20  Fred was an accomplice to the murders, if not the actual murderer.  (Tr1 RT 49, 244.)

21  Physical evidence, such as a rope found in Fred's jacket pocket that was similar to the

22  one used to kill the victims, linked Fred to the crimes.  (Tr1 RT 48, 107, 158, 161-62,

23  189, 250, 258, 528, 617, 915.)  Moreover, by his own admission, Fred was in the

24  orange grove with the women when they died, so opportunity to commit the crimes was

25  never in dispute.  And though Sheila changed her story at trial, she initially accused her

26  own brother of the crimes.

27       As the foregoing shows, significant inconsistencies, discrepancies and

28  implausibilities marred Fred's testimony.  Moreover, Fred's testimony was inherently

suspect given Fred's undeniable motive to shift blame to Anderson.  Thus, at best, Fred's testimony provided a weak foundation for a prosecution.

The two remaining pieces of inculpatory evidence Respondent emphasizes in his brief are also not compelling.  First, shoeprints were found at the crime scene that matched Anderson's shoes.  But the forensic testing of the shoeprints was incomplete (*see* Pet. Br. at 26) and Anderson's testimony accounted for why his shoeprints were near the bodies.  (*See* Tr1 RT 676-82.)  Second, while Sheila possessed items that once belonged to the victims, Anderson's testimony also explained away that purportedly incriminating fact.  (*See, e.g.*, Tr1 RT 676-82.)  Thus, while the shoeprints and possessions corroborated Fred's testimony, they also corroborated Anderson's.

The weakness of Fred's testimony makes clear that Sheila's extrajudicial statements were incredibly important to the prosecution's case, which is the second *Van Arsdall* factor.  *Van Arsdall*, 475 U.S. at 684.  Without Sheila's out-of-court statements, the case would have been in a state of equipoise.  Fred's testimony directly conflicted with Anderson's on the ultimate question of who was responsible for the murders.  Sheila's extrajudicial statements answered that question for the jury.  By implicating Anderson in the crimes while simultaneously exonerating her brother, Sheila's statements had the dual effect of bolstering the prosecution's case while destroying Anderson's defense.

Respondent makes a passing reference to the third *Van Arsdall* factor, whether the extrajudicial statements were cumulative.  *See Van Arsdall*, 475 U.S. at 684.  Respondent notes that the California Supreme Court found that Sheila's extrajudicial statements were cumulative (Resp. Br. at 10 (citing *Anderson I*, 43 Cal. 3d at 1129)), but a closer examination reveals that they were not.  Preliminarily, parts of Sheila's extrajudicial statements were not duplicative of any other evidence.  For example, no testifying witness saw Anderson kill Flanagan, but Sheila's experts testified that she told them she had.  And no testifying witness said Anderson confessed Coselman's murder to them, but Sheila's experts testified Sheila stated just that.  The jury was only

12

able to hear these statements because they were elicited through Sheila's experts' testimony.  Lastly, it was only through Sheila's extrajudicial statements that the jury learned she purportedly lied when she initially implicated Fred in the murders.  Had those statements not been introduced, then the jury never would have learned that Sheila was distancing herself from her initial accusation of Fred.

Furthermore, while there were parts of Sheila's statements that were similar to Fred's testimony—for instance, statements about the unconsummated gas station robbery, how Coselman was robbed, and whether Anderson was the leader of the group—those similarities do not necessarily mean that Sheila's statements were cumulative.  As the California Supreme Court has explained, under California law, evidence that is "identical in subject matter to other evidence" is not cumulative if "it has greater evidentiary weight or probative value."  *People v. Scott*, 61 Cal. 4th 363, 399 (2015) (citing Cal. Evid. Code § 352).  Sheila's statements provided arguably the strongest evidence exonerating Fred of any wrongdoing, which then concomitantly added a patina of credibility to Fred's testimony, which in turn strengthened the prosecution's case.  Because her statements affected the prosecution's case in a different way, arguably a greater way, than Fred's testimony did, her statements were not cumulative of Fred's testimony, even though they overlapped in subject matter.

The fourth factor, "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," *Van Arsdall*, 475 U.S. at 684, ties in with the cumulativeness argument above.  As noted, there were aspects of Sheila's statements that were not corroborated by any other testimony.

As for the remaining *Van Arsdall* factor—"the extent of cross-examination otherwise permitted"—Respondent argues that Anderson had "the opportunity to cross-examine Sheila's mental health professional[s] and her brother Fred."  (Resp. Br. at 11.)  Respondent misunderstands what the Supreme Court meant in *Van Arsdall*.  The Court was concerned with the opportunity to cross-examine the declarant on the statements at issue.  *Van Arsdall*, 475 U.S. at 684.  Sheila is the declarant and because

1  she never took the stand, Anderson never had any opportunity to cross-examine her.

2  There can be no question that this factor weighs in Anderson's favor.

3      Thus, an evaluation of the five *Van Arsdall* factors demonstrates that Anderson

4  was prejudiced by the *Bruton* error.  There also exists, however, other objective indicia

5  of prejudice.  The Ninth Circuit routinely looks to closing arguments when assessing

6  the prejudicial impact of a constitutional error.  *See Winzer v. Hall*, 494 F.3d 1192,

7  1202 (9th Cir. 2007) (finding prejudice, and granting relief under AEDPA, where "the

8  prosecutor took full advantage of" the Confrontation Clause violation in her closing

9  argument); *Reynoso v. Giurbino*, 462 F.3d 1099, 1117-18 (9th Cir. 2006) (same).  This

10  Court should do so as well.  Sheila's attorney essentially acted as a second prosecutor,

11  relying heavily on Sheila's extrajudicial statements to argue that Anderson was the

12  killer who forced Sheila to participate in the crimes.  (*See* Tr1 RT 1187-88, 1201.)

13  And, as the California Supreme Court noted in its opinion, during his closing argument

14  the prosecutor "dwelled on the experts' testimony and quoted liberally from Sheila's

15  extrajudicial statements incriminating" Anderson.  *Anderson I*, 43 Cal. 3d at 1126.  In

16  rebuttal, the prosecutor even went so far as to say that he agreed "with 95 percent of

17  what" Sheila's defense attorney argued.  (Tr1 RT 1201.)  The prosecutor also explicitly

18  urged the jury to find Sheila's backdoor testimony credible, even though she never took

19  the stand.  (Tr1 RT 944-45.)  The central role Sheila's extrajudicial statements played

20  during closing arguments therefore further underscores how prejudicial those

21  statements were to Anderson's defense.  *See Winzer*, 494 F.3d at 1202; *Reynoso*, 462

22  F.3d at 1117-18.

23      For the reasons set forth above and in Anderson's opening brief, the *Bruton* error

24  here had a substantial and injurious effect on the jury's verdict.  *Brecht*, 507 U.S. at

25  623; *Ayala*, 135 S. Ct. at 2199.

26

27

28

14

1
2
3

**B.     This Court should grant relief because the trial court failed to exclude "other crimes" evidence about Anderson allegedly pimping Sheila (Claim Twelve).**

4
5
6
7
8
9
10
11

Respondent's opposition applies the wrong standard of review to this claim.  He asserts that "the highly deferential AEDPA standard of review [i.e., 28 U.S.C. § 2254(d)] applies" here.  (Resp. Br. at 12.)  It does not.  As Respondent indicates elsewhere in his brief, "Where the state court denial rests on a procedural ground, the federal court conducts *de novo* review of the merits."  (Resp. Br. at 68 (citing *Cone*, 556 U.S. at 472, and *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002)).  That rule equally applies here because the California Supreme Court denied this claim exclusively on procedural grounds:

12
13
14
15
16

> Defendant may not now complain of the admission of the evidence relating to pimping as violative of the *Thompson* rule.  "Because of [his] failure to make a timely and specific objection on this ground, . . . the point must be deemed waived."

17
18

*Anderson I*, 43 Cal. 3d at 1136.[4]  Respondent offers no basis to deviate from *Cone v. Bell* in the analysis of this claim.

19
20
21
22
23
24
25

Respondent also assumes the applicability of § 2254(d)(1)'s "clearly established federal law" limitation to this claim.  But as noted above in Section II, where, as here, a federal court reviews a habeas claim under de novo review, § 2254(d)(1)'s clearly established federal law requirement is inapplicable.  *See Hinojosa*, 803 F.3d at 421 n.6.  Accordingly, Anderson can base his claim on circuit precedent, *id.*, and he did so in his opening brief.  (*See* Pet. Br. at 32 (citing *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), *Alcala v. Woodford*, 334 F.3d 862, 887 (9th Cir. 2003), *McKinney v.*

26

27
28

---

[4]  Under California's *Thompson* rule, "other crimes" evidence is generally inadmissible.  *See People v. Thompson*, 27 Cal. 3d 303, 314-18 (1980).

1   *Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993), and *Jammal v. Van de Kamp*, 926 F.2d 918,

2   919-20 (9th Cir. 1991), all of which recognize that the erroneous admission of evidence

3   can violate due process).)

4          Significantly, Respondent does not seriously challenge Anderson's contention

5   that the "other crimes" evidence here was erroneously admitted.  Instead, he argues that

6   Anderson's claim is a "state evidentiary" claim that is not cognizable on federal habeas.

7   (Resp. Br. at 13.)  This argument is meritless.  Anderson has unequivocally framed the

8   erroneous admission of this evidence as a due process violation that rendered his trial

9   fundamentally unfair.  (Pet. Br. at 31-37.)

10         Respondent's argument that this error did not render the trial fundamentally

11  unfair also lacks merit.  As explained in Anderson's opening brief, the applicable test is

12  whether the erroneous admission of evidence was "irrelevant to the prosecution's case"

13  and "'of such quality as necessarily prevents a fair trial.'"  *Alcala*, 334 F.3d at 887

14  (quoting *McKinney*, 993 F.2d at 1384).  Anderson meets both prongs of this test.

15         First, whether Anderson pimped Sheila was wholly immaterial to whether

16  Anderson murdered, kidnapped, and robbed Coselman and Flanagan.  (Pet. Br. at 33-

17  34.)  The pimping evidence was therefore irrelevant to the prosecution's case, and

18  Respondent does not argue otherwise.  (*See* Resp. Br. at 15.)  Instead, he contends that

19  this evidence was relevant to Sheila's diminished capacity defense.  (*Id.*)  But the focus

20  here is on "the prosecution's case," not on the co-defendant's defense.  *Alcala*, 334

21  F.3d at 887; *see also McKinney*, 993 F.2d at 1384.

22         Second, the evidence was "'of such quality as necessarily prevents a fair trial.'"

23  *Alcala*, 334 F.3d at 887 (quoting *McKinney*, 993 F.2d at 1384).  The pimping evidence

24  was emotionally-charged and allowed the prosecution and Sheila's defense attorney to

25  assassinate Anderson's character.  It also had the added effect of bolstering Fred's

26  testimony, which painted Anderson as the leader of the group.  The prejudice caused by

27  this erroneous admission of irrelevant evidence was exacerbated by the trial court's

28  failure to give appropriate limiting instructions when this evidence was introduced, and

16

1    the role this evidence played in the closing arguments.  (*See* Pet. Br. at 36-37.)  In light

2    of the foregoing, this evidence rendered Anderson's trial fundamentally unfair.

3            As discussed in Anderson's opening brief, there is no need to also conduct a

4    *Brecht* analysis once this Court determines that the erroneous admission of evidence

5    rendered Anderson's trial fundamentally unfair, since those analyses are co-extensive.

6    *See Dillard v. Roe*, 244 F.3d 758, 773 (9th Cir. 2001) (explaining that the *Brecht*

7    analysis is co-extensive with the fundamental-unfairness analysis).

8    **C.    This Court should grant habeas relief based on the trial court's failure**

9           **to exclude "other crimes" evidence of an unconsummated gas station**

10          **robbery (Claim Thirteen).**

11           Respondent argues that § 2254(d) applies to the error component of this claim.

12   (Resp. Br. at 26 ("the highly deferential AEDPA standard of review applies in the

13   analysis of this claim.").)  It does not.  In its opinion, the California Supreme Court

14   assumed that the trial court erred in admitting evidence of Anderson's supposed plan to

15   rob a gas station.  *Anderson I*, 43 Cal. 3d at 1137 ("Assuming the court erred in

16   admitting the evidence of defendant's plan to rob the gasoline station, we must now

17   decide whether the claimed error was prejudicial.").  When a court assumes error, it is

18   not deciding whether error occurred, i.e., it is not adjudicating that component of the

19   claim.  Accordingly, this Court reviews the error component of this claim

20   unencumbered by AEDPA deference, i.e., de novo.  *See Porter v. McCollum*, 558 U.S.

21   30, 39 (2009) ("Because the state court did not decide whether Porter's counsel was

22   deficient, we review this element of Porter's *Strickland* claim *de novo*."); *Reynoso*, 462

23   F.3d at 1109 (explaining that when it is clear that a state court has not decided an issue,

24   federal courts review that issue de novo); *Borrero v. Fleming*, 143 F. App'x 774, 775

25   (9th Cir. 2005) (unpublished) (analyzing only the state court's harmless error

26   determination under § 2254(d) because the state court assumed that a jury instruction

27   was erroneously admitted).

28

1    Because this Court is reviewing the error component of this claim de novo,

2    Anderson can base his claim on circuit law.  *Hinojosa*, 803 F.3d at 421 n.6.

3    Respondent's argument to the contrary is wrong.  (Resp. Br. at 17 (arguing that

4    Anderson cannot prevail on this claim because the United States Supreme Court "has

5    not ruled that the admission of other crimes evidence constitutes a violation of due

6    process").[5]  As with Claim Twelve, Anderson argued that the erroneous admission of

7    this evidence violated the Due Process Clause. (*See* Pet. Br. at 40 (citing *Holley*, 568

8    F.3d at 1101, *Alcala*, 334 F.3d at 887, *McKinney*, 993 F.2d at 1384, and *Jammal*, 926

9    F.2d at 919-20).

10    Under de novo review, the evidence was erroneously admitted since it was not

11    relevant to the prosecution's case.  *Alcala*, 334 F.3d at 887.  Respondent disagrees and

12    argues that the California Supreme Court observed that this evidence was relevant to

13    Anderson's alleged modus operandi for robberies, which supposedly involved tying up

14    victims with rope.  (Resp. Br. at 17.)  But the prosecution did not seek to admit the

15    evidence to establish Anderson's modus operandi; the prosecution sought to admit it to

16    establish motive and intent.  (Tr1 RT 211-12.)  And as explained in Anderson's

17    opening brief, the prosecution failed to establish the necessary conditions to admit the

18    evidence on those bases.  (Pet. Br. at 40-41.)  Accordingly, the trial court erred in

19    admitting the evidence.

20    Regarding whether this error was "of such quality as necessarily prevents a fair

21    trial," *Alcala*, 334 F.3d at 887, Respondent again argues that Anderson could not have

22    been prejudiced because there was overwhelming evidence of his guilt.  (Resp. Br. at

23    17.)  For the reasons set forth in Claim Two, this Court should reject that argument.

24    (*See supra* discussion re: Claim Two, explaining that the prosecution's case was weak.)

25

26

27    ───────────────

      [5]  Also, because Anderson is challenging the denial of this claim under
§ 2254(d)(2), he can base his claim on circuit precedent should this Court analyze it

28    under that theory.  *See Thaler*, 559 U.S. at 44; *Davis*, 443 F.3d at 1158-59.

18

Also, Respondent does not substantively address Anderson's remaining arguments about how he was prejudiced by this error:  the evidence confused the jury; it painted Anderson in a negative light thereby diminishing his credibility; and because Fred's testimony and Sheila's extrajudicial statements both referenced this unconsummated crime, this evidence bolstered each other's credibility in the eyes of the jury.  (Pet. Br. at 42.)  The absence of a proper limiting instruction further exacerbated the prejudicial impact of this evidence.  (*Id.* at 42-43.)  For these reasons, this error rendered Anderson's trial fundamentally unfair.  *See Dillard*, 44 F.3d at 773 (explaining that the *Brecht* analysis is co-extensive with the fundamental-unfairness analysis).

**D.    This Court should grant habeas relief because the trial court refused to grant Anderson's request for a change of venue (Claim Three).**

As explained in Anderson's opening brief, media coverage of the murders blanketed the Indio community, which was predominately white, isolated, and sparsely populated at the time of trial.  Given the circumstances surrounding the murders—a white grandmother and granddaughter allegedly killed by a young black man and his white girlfriend, while the girlfriend's hapless brother stood by as a witness—the Indio community became enthralled by the crimes and the resulting criminal proceedings. The local media did not simply report facts; instead, it painted Anderson as the primary perpetrator of the murders and Fred as the innocent bystander.  The media's coverage tainted the prospective juror pool in the Indio community, causing the potential jurors to prejudge Anderson guilty of the murders.  Because it was clear that Anderson would not be given a fair trial in Indio, the trial court should have granted Anderson's request for a change of venue.  (*See* Pet. Br. at 43-48.)

Respondent asserts that Anderson's claim fails because Anderson fails to establish actual prejudice.  This argument lacks merit.  A petitioner does not have to demonstrate actual prejudice to prevail on his claim that a trial court should have transferred venue in a criminal case.  *Sheppard v. Maxwell*, 384 U.S. 333, 352 (1966).  Under certain circumstances, a court may presume prejudice.  *Rideau v. Louisiana*, 373

1    U.S. 723, 726 (1963).  Specifically, this presumption is warranted "when the record

2    demonstrates that the community where the trial was held was saturated with

3    prejudicial and inflammatory media publicity about the crime."  *Harris v. Pulley*, 885

4    F.2d 1354, 1361 (9th Cir. 1988) (citing *Rideau*, 373 U.S. at 726; *Murphy v. Florida*,

5    421 U.S. 794, 798-99 (1975)).

6        A presumption of prejudice is warranted here.  As detailed in Anderson's petition

7    and opening brief (*see* Am. Pet. at 72-77; Pet. Br. at 43-48), the Indio community was

8    "saturated with prejudicial and inflammatory media publicity sufficient for a

9    presumption of prejudice."  *Daniels v. Woodford,* 428 F.3d 1181, 1211 (9th Cir. 2005).

10   Significantly, most of this media coverage occurred before trial.  As the United States

11   Supreme Court observed in *Estes v. State of Tex.*, 381 U.S. 532, 536-37 (1965),

12   "Pretrial [publicity] can create a major problem for the defendant in a criminal case.

13   Indeed, it may be more harmful than publicity during the trial for it may well settle the

14   community opinion as to guilt or innocence."

15   **E.    This Court should grant habeas relief because the jury saw Anderson**

16   **shackled at trial (Claim Eight).**

17        The parties agree that because the California Supreme Court denied this claim on

18   procedural grounds and not on the merits, the appropriate standard of review is de

19   novo.  (Pet. Br. at 49; Resp. Br. at 23.)

20        In his opposition, Respondent characterizes this claim as a "[c]onclusory

21   allegation[] devoid of factual detail" that is "insufficient to warrant habeas relief."

22   (Resp. Br.  at 24.)  But Juror Michelle T.'s declaration unequivocally establishes that

23   Anderson was shackled during his 1979 trial.  (Ex. 74, Juror Michelle T. Decl., ¶ 5.)[6]  It

24   is unclear what other evidence Respondent wants Anderson to produce in order to

25   establish he was shackled in the presence of jurors.

26

27        [6] Unless otherwise noted, "Ex." refers to the exhibits Anderson filed in support

28   of his First Amended Petition.

20

1    This Court should presume that the shackling prejudiced Anderson.  It is well-

2    established that shackling is constitutionally problematic because it undermines three

3    fundamental legal principles: a criminal defendant is presumed innocent until proven

4    guilty; a criminal defendant has a right to communicate with counsel; and a criminal

5    defendant has a right to dignity and decorum in the proceedings against him.  *Deck v.*

6    *Missouri*, 544 U.S. 622, 630-32 (2005).  The trial court's decision here undermined

7    these three fundamental legal principles that are at the heart of the American criminal

8    justice system.  In light of that, a presumption of prejudice is warranted.  *See Holbrook*

9    *v. Flynn*, 475 U.S. 560, 568 (1986) (describing shackling as an "inherently prejudicial

10   practice").

11   But even if this Court does not presume prejudice, this Court should find that

12   Anderson was actually prejudiced based on the circumstances of this case.  The case

13   essentially boiled down to a credibility contest between Fred and Anderson.  Fred

14   testified unshackled and Anderson was shackled at trial.  The inferences the jury likely

15   drew from this juxtaposition must have had a substantial and injurious effect on their

16   verdict.

17   **F.    This Court should grant habeas relief because the trial court**

18   **erroneously admitted prejudicial crime-scene photographs (Claim**

19   **Eleven).**

20   In his opening brief, Anderson argues that § 2254(d) applies to this entire claim

21   because the California Supreme Court decided both the error and prejudice components

22   of this claim.  (Pet. Br. at 53-54.)  However, upon closer examination, this Court

23   reviews de novo the question of whether these photographs were admitted in error.  In

24   *People v. Anderson* (*Anderson II*), 25 Cal. 4th 543, 593 (2001), the court observes that

25   it never decided whether these photographs were properly admitted, only that it had

26   "serious doubt" that they were.

27   The California Supreme Court was correct to have "serious doubts" that the

28   photographs never should have been admitted.  The prosecution did not use the

1  photographs to establish the cause or manner of Flanagan's death. Furthermore, the

2  photographs did not relate to any element of the crimes. The photographs thus served

3  no legitimate purpose for the prosecution in establishing its case-in-chief. [7]

4       The only remaining question is whether this error rendered Anderson's trial

5  fundamentally unfair. *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1466 (9th Cir.

6  1986). This analysis is, as mentioned above, co-extensive with *Brecht*. *See Dillard*,

7  244 F.3d at 773 (citing *Brecht*, 507 U.S. at 637).

8       The admission of the photographs rendered Anderson's trial fundamentally

9  unfair. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). The context in which the

10  crimes and the trial occurred was racially charged. As explained in the opening brief

11  and above, Anderson, a young black man, was accused of killing two white women in

12  one of the least diverse areas of a county that had a long, sordid history of racial

13  discrimination, particularly as it pertained to African-Americans. The admission of the

14  photographs inflamed the jury's passions and explicit and implicit racial biases.

15  **G.**    **This Court should grant habeas relief because the trial court failed to**

16          **properly instruct the jury (Claim Fifteen (A)).**

17       The trial court erred when it failed to instruct the jury that Fred was an

18  accomplice as a matter of law. As explained in the opening brief, the record indicates

19  that Fred was driving the car when he, Sheila, and Anderson stopped to assist Flanagan

20  and Coselman on the side of the road. Fred testified that he drove his car down the

21  Dillion Road off-ramp from Interstate 10 when he heard Anderson tell Coselman that

22  he was going to rob her. Fred drove his car to a secluded area where the robbery and

23  eventual murder occurred. Furthermore, by his own admission, Fred took control of

24

25

26       [7]  Anderson does not need to point to clearly established federal law to prevail on
this claim. Per *Hinojosa*, 803 F.3d at 421 n.6, he can rely on circuit law because this

27  Court is reviewing the error component of the claim de novo. Also, he asserts a
§ 2254(d)(2) theory, which allows him to rely on circuit law as well. *Thaler*, 559 U.S.

28  at 44; *Davis*, 443 F.3d at 1158-59.

1    Coselman while she was tied to a tree and agreed to stay with her while Anderson and

2    Sheila borrowed his car to get Flanagan.  Fred did not help Coselman escape even

3    though he had an opportunity to do so.  Also, the police found the same rope used to tie

4    up the victims in Fred's jacket pocket.  Based on these facts, Anderson established that

5    Fred was an accomplice as matter of law by a preponderance of the evidence, and the

6    trial court should have instructed the jury accordingly.

7           Respondent is wrong that *People v. Dailey*, 179 Cal. App. 2d 482 (1960), and

8    *People v. Robinson*, 61 Cal. 2d 373 (1964), are distinguishable.  In *Dailey*, the court

9    held that an accomplice instruction was warranted where the witness knew the

10   defendants were going to commit a crime and actively participated in helping the

11   defendants commit the crime.  Here, according to Fred's own testimony, he knew that

12   Anderson was going to commit a crime, and he actively participated in helping him

13   commit the crimes.  Similarly, like the witness in *Robinson*, Fred admitted his

14   involvement in the crime at trial.  There is no meaningful difference between this case

15   and *Dailey* and *Robinson*.  (*See* Pet. Br. at 56-61.)

16          Furthermore, the fact that Fred "vigorously and steadfastly denied that he acted

17   with the requisite criminal intent" is inconsequential.  (Resp. Br. at 30.)  Although Fred,

18   a large man by any measure, testified that he acted out of fear, Fred never explained

19   how the diminutive, thinly-built Anderson put him in fear.  Furthermore, Fred's

20   testimony that he acted in fear was contradicted by his own actions.  Fred testified that

21   he refused to participate in an alleged unconsummated robbery of a gas station

22   attendant a few days prior to the murders.  (Tr1 RT 257-58, 302.)  If Fred had no

23   difficulty standing up to Anderson a few days before the murders, then one would think

24   he would have been able to stand up to Anderson during the murders.

25          The California Supreme Court's conclusion that the trial court did not err in

26   failing to instruct the jury is an unreasonable determination of the facts in the record.

27   *Taylor v. Maddox*, 366 F.3d 992, 1008 (9th Cir. 2004) (state-court decision is

28   unreasonable where state court's finding is contradicted by record).  Fred's testimony

demonstrates he had "knowledge of [Anderson's alleged] criminal purpose," and he acted "with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." *Anderson I*, 43 Cal. 3d at 1138 (citing the standard for the accomplice instruction, as articulated by *People v. Beeman*, 35 Cal. 3d 547, 560 (1984)). Since the California Supreme Court's conclusion to the contrary is refuted by the record, it is therefore unreasonable. *See Brumfield v. Cain*, 135 S. Ct. 2269, 2280-82 (2015) (finding § 2254(d)(2) satisfied where the state court also concluded "that the record failed to raise any question as to Brumfield's 'impairment in adaptive skills,'" where in fact "the state-court record provided substantial grounds to question Brumfield's adaptive functioning").

The California Supreme Court's determination is also an unreasonable application of clearly established federal law. Anderson had a constitutional right to present a complete defense. *California v. Trombetta*, 467 U.S. 479, 485 (1984). Coterminous with this right is the right "to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Matthews v. United States*, 485 U.S. 58, 63 (1988). Here, Anderson's primary theory of defense was lingering doubt, and an instruction that Fred was an accomplice as a matter of law went towards that theory. The trial court's failure to properly instruct the jury severely handicapped Anderson's ability to mount an effective defense.

This Court must also decide if the constitutional error had a substantial and injurious effect on the jury verdict. *Brecht*, 507 U.S. at 637. As explained in the opening brief, an accomplice instruction would have required the prosecution to present evidence to corroborate Fred's testimony, which the prosecution would have been unable to do. Thus, the jury would have been instructed to disregard those parts of Fred's testimony that were uncorroborated. Given the importance of Fred's testimony to this case, the prosecution would have been unable to mount a convincing case against Anderson.

**H.**     **This Court should grant habeas relief because the jury's verdict is based on false and unreliable evidence (Claim Nine).**

    **1.**     **This Court should grant relief on Anderson's *Napue* claim.**

    Respondent asserts that "Anderson does not claim there was prosecutorial misconduct" in his case. (*See* Resp. Br. at 34.). That is incorrect. The main case Anderson relies on here is *Napue v. Illinois*, 360 U.S. 264 (1959). If a prosecutor violates *Napue*, then it necessarily follows that he committed misconduct. *Dow v. Virga*, 729 F.3d 1041, 1043 (9th Cir. 2013) ("The prosecutor's misconduct violates the basic tenet of *Napue v. Illinois,* which prohibits 'soliciting false evidence,' and requires the prosecutor to not 'allow[ ] it to go uncorrected when it appears.'") (quoting *Napue*, 360 U.S. at  269). Anderson also alleges that the prosecutor acted unethically here by pursuing a conviction based on highly questionable evidence. (Pet. Br. at 64.)

    The prosecutorial misconduct here was extensive. Over several pages in his opening brief Anderson explains why Fred's testimony and Sheila's extrajudicial statements were false and of questionable reliability, and how the Anders, along with the local prosecutors and law enforcement officials, conspired together to ensure that Anderson was convicted of the charged crimes. (Pet. Br. at 62-66.) In a single paragraph, Respondent dismisses Anderson's claim, suggesting that Anderson cannot demonstrate prejudice by virtue of the fact that the California Supreme Court found that the challenged evidence was properly admitted. (Resp. Br. at 34-35.) But while "AEDPA requires that [this Court] treat the decisions of state courts with deference," "it does not insulate them totally from [this Court's] review when federal constitutional rights are implicated." *Boyer v. Belleque*, 659 F.3d 957, 965-66 (9th Cir. 2011). A close review of the evidence here demonstrates that the prosecutor knew, or should have known, that his case was built on false and questionable evidence. (*See* Pet. Br. at 62-66.)

    Respondent asserts that Anderson is not entitled to habeas relief on his *Napue* claim because he cannot satisfy *Brecht*. (Resp. Br. at 36.) Not only does Anderson not

have to satisfy *Brecht*, but the prejudice standard for a *Napue* claim is less-demanding than the *Brecht* prejudice standard:

> Although the government's knowing use of false testimony does not automatically require reversal, courts apply a less demanding materiality standard to *Napue* errors: whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." This materiality standard is, in effect, a form of harmless error review, but a far lesser showing of harm is required under *Napue*'s materiality standard than under ordinary harmless error review. *Napue* requires us to determine only whether the error *could* have affected the judgment of the jury, whereas ordinary harmless error review requires us to determine whether the error *would* have done so.

*Dow*, 729 F.3d at 1048 (internal citations and quotation marks omitted).

And as explained in Anderson's opening brief, he meets this standard. (*See* Pet. Br. at 66-68.)

## 2. This Court should grant relief on Anderson's separate due process claim.

Even if this Court declines to grant habeas relief based on the prosecutor's *Napue* violation, this Court should grant relief based on a separate due process violation. In *Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012), the Supreme Court rejected the petitioner's due process claim about a suggestive in-field show up, explaining that "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id.* at 728.

The taint of improper state conduct that was missing in *Perry* is present here. As explained in Anderson's opening brief, based on Fred's account of what happened, the

26

police zeroed in on Anderson, ignoring all other potential leads during their investigation.  (Pet. Br. at 63)  Even after Sheila accused Fred of the murders, the police refused to treat Fred like a suspect, and instead treated him with benevolence rather than suspicion.  (*Id.*)  This is most apparent with the police's treatment of Fred's shoes.  The police never tested Fred's shoes to determine whether Fred left any shoeprints near the bodies.  (Tr1 RT 27, 46, 1109-10.)  And it was not just the police that acted improperly, so did the judge when he allowed Fred, the prosecution's star witness, and Sheila, Anderson's co-defendant, to meet secretly in court in the middle of the trial.  (Tr1 RT 99.)  Because no court reporter was present, it is unclear what those two discussed.  This type of clandestine meeting offends basic notions of fairness.

In light of the improper state conduct and the questionable reliability of the prosecution's evidence, Anderson's convictions violate the Due Process Clause.  *See Perry*, 132 S. Ct. at 723 ("The Constitution, our decisions indicate, protects a defendant against a conviction based on evidence of questionable reliability"); *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (Due Process Clause protects individuals from prosecutions that violate those "fundamental conceptions of justice which lie at the base of our civil and political institutions," and which define "the community's sense of fair play and decency").

I.   **This Court should grant habeas relief because Michael Lewis was ineffective.**

1.   **Governing standards**

Generally speaking, the parties agree on the governing principles for Anderson's *Strickland* claims.  (Pet. Br. at 68; Resp. Br. at 36, 43, 46.)

2.   **Lewis was ineffective for failing to adequately investigate and present mental health evidence at guilt (Claim One.B.2).**

In his opposition, Respondent largely focuses on the question of whether trial counsel Michael Lewis was deficient.  (*See* Resp. Br. at 39-43.)  His position is, as shown below, based on an untenable view of what is required of trial counsel in a

27

1  capital case.  The only substantive argument Respondent makes relating to prejudice is

2  that there is not "a single report prior to 1997 [that] makes reference to the possibility

3  that Anderson had an organic brain damage."  (Resp. Br. at 40.)[8]  To the extent

4  Respondent suggests that at the time of trial Anderson could not have presented

5  evidence that he was brain damaged, Respondent is wrong.  As shown below, Anderson

6  was brain damaged, and also suffered from a serious mental illness, at the time of the

7  crimes and the trial.  Had Lewis ensured that Anderson was adequately evaluated by

8  mental health experts, Lewis could have presented compelling mental health evidence

9  to the jury.

10              a.      **Lewis was deficient.**

11          In 1979, shortly before trial, Lewis hired two mental health experts to examine

12  Anderson, psychiatrist Michael Coburn and psychologist Dr. Stephen Lawrence.  Lewis

13  told Dr. Coburn that although he was interested in Anderson's state of mind at the time

14  of the crimes, he was "more interested in factors which" he could present at penalty.

15  (Ex. 18, Dr. Coburn Decl., ¶ 1.)  The only records that Lewis provided Dr. Coburn were

16  copies of the police reports.  (*Id.*)  It is unclear if Lewis provided any material to Dr.

17  Lawrence, though Dr. Lawrence's billing statements suggest he reviewed even less

18  than Dr. Coburn did.  (Pet. Br. at 74 n.22 (citing Tr1 RT CT 411).)  Dr. Coburn spent

19  no more than an hour interviewing Anderson.  (Ex. 18, Dr. Coburn Decl., ¶ 2.)  Dr.

20  Lawrence appears to have spent even less time than that.  (Pet. Br. at 74 n.22.)  No

21  other mental health testing or examinations were conducted before trial.  Not

22  surprisingly, Lewis presented no mental health evidence to the jury.

23          In Respondent's view, despite the stunningly limited nature of Lewis's

24  investigation, Lewis acted reasonably.  Respondent bases his view on his belief that in

25  the absence of a request, "a defense attorney is not deficient for failing to gather

26

27          [8]  He makes a similar observation when analyzing Anderson's distinct claim that

28  trial counsel from Anderson's penalty retrial was ineffective.  (Resp. Br. at 82.)

background material that might be helpful to a mental health expert evaluating his client." (Resp. Br. at 42.) In support of this proposition, Respondent primarily relies on two district court cases and an out-of-circuit case. However, controlling authority directly undermines Respondent's view.

Under Ninth Circuit law, trial counsel has "an obligation to conduct an investigation which will allow a determination of what sort of experts to consult." *Caro v. Calderon,* 165 F.3d 1223, 1226 (9th Cir. 1999). "Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert." *Id.*; *see also Stanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010) ("[T]rial counsel has an affirmative duty to provide mental health experts with all information relevant to the formulation of their conclusions."); *Caro v. Woodford*, 280 F.3d 1247, 1254-55 (9th Cir. 2002) ("counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health"); *Wallace v. Stewart,* 184 F.3d 1112, 1116 (9th Cir. 1999) (counsel has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request"); *Clabourne v. Lewis*, 64 F.3d 1373, 1385 (9th Cir. 1995) (trial counsel "committed a commensurate error in failing to provide the state's experts with materials they needed to develop an accurate profile of Clabourne's mental health"). These obligations exist because a mental health expert cannot "develop an accurate profile of the defendant's mental health" if trial counsel does not provide them with basic information relevant to that expert's evaluation. *Caro*, 280 F.3d at 1254. Noticeably absent from Respondent's brief is any mention of these authorities.

Contrary to what Respondent argues, trial counsel cannot simply hire experts and blindly rely on their opinions. Trial counsel must do more. Ironically, some of Respondent's own authorities provide examples of what trial counsel must do to meet minimum standards of competency. Contrasting those cases with this one reveals the inadequacy of Lewis's investigation.

29

For instance, Respondent cites *Harris v. Vasquez*, 949 F.2d 1497 (9th Cir. 1990). Defense counsel in that case provided his experts with another expert's report that included 10.5 hours of psychological testing and scoring, 3 hours of psychiatric evaluation and reporting, and the review of records. *Id.* at 1502. The defense attorney also "provided these psychiatrists with all of the material he had relating to Harris's background." *Id.* at 1502. In *In re Fields*, 51 Cal. 3d 1063 (1990), the defense attorney obtained the defendant's prison psychiatric records, the investigator's logs showed an investigation focused on a diminished capacity defense, and trial counsel then hired three experts who concurred in a diagnosis. *Id.* at 1074-75. In *People v. Williams*, 44 Cal. 3d 883 (1988), *as modified on denial of reh'g* (May 19, 1988), the California Supreme Court specifically noted that the record on appeal did not establish that "counsel failed to obtain relevant records." *Id.* at 917. To the contrary, counsel made "'reasonable efforts to investigate the factual framework underlying the defense' of diminished capacity in an attempt to obtain additional evidence in the form of expert opinion to bolster the defense." *Id.* at 945. The courts in all three of these cases found the defense investigations to be adequate.

Lewis's investigation stands in stark contrast to these investigations. On July 3, 1979, about two months before trial began, Lewis admitted in a declaration that he had not conducted an adequate investigation. (Tr1 CT 200-01.) Just ten days later Dr. Coburn interviewed Anderson. (Ex. 18, Dr. Coburn Decl., ¶ 2.) In preparation for that interview, it took Dr. Coburn only 15 minutes to review the records counsel had provided him, which consisted solely of police reports. (*Id.* ¶¶ 1-2.) As explained in Anderson's opening brief, Dr. Lawrence's billing records suggest he spent even less time preparing for the interview than Dr. Coburn did. (Pet. Br. at 74 n.22.) Significantly, information about Anderson's traumatic and tragic childhood, his family's history of mental illness, and his personal history of head injuries was not made available to either Dr. Coburn or Dr. Lawrence. It comes as little surprise, then, that both experts conducted extremely superficial examinations of Anderson; neither

30

1   spent more than an hour examining him.  (Ex. 18, Dr. Coburn Decl., ¶ 2; Ex. B,

2   11/29/1994 Letter to McAlister.)[9]

3          Lewis's investigation is thus vastly different, both in scope and in kind, from the

4   investigations that were conducted in *Harris*, *Fields*, and *Williams*.  Regarding the

5   scope of Lewis's investigation, he, as noted above, focused his experts' investigation

6   on penalty-phase issues, while seemingly paying nothing more than lip service to the

7   potential of guilt-phase issues.  (Ex. 18, Dr. Coburn Decl., ¶ 1; Ex. A, 07/02/1979

8   Letter from Lewis to Dr.  Michael Coburn p. 2.)[10]  By contrast, the attorneys in *Harris*,

9   *Fields*, and *Williams* specifically directed their experts to explore guilt-phase issues.

10  *Harris*, 949 F.2d at 1502 ("Ryan hired two psychiatrists on a confidential basis to

11  review Griswold's report and to investigate mental defenses such as insanity,

12  diminished capacity, and potential mitigation at the penalty phase."); *Fields*, 51 Cal. 3d

13  at 1074 (counsel appointing two experts to examine defendant before he pled not guilty

14  by reason of insanity; two more were subsequently appointed to inquire into defendant's

15  sanity); *Williams*, 44 Cal. 3d at 917 (defendant was examined by "two physicians

16  appointed to render opinions regarding defendant's competence to stand trial, sanity,

17  and diminished capacity").

18         As for the kind of investigation that was conducted, as shown above, the

19  evaluations Lewis's experts conducted were markedly different from the ones in

20  *Harris*, *Fields*, and *Williams*.  The experts in those cases spent hours upon hours

21  interviewing the defendants; here, the experts conducted brief exams lasting no more

22  than one hour, based on very limited information.

23         In short, Lewis unreasonably failed to conduct an adequate investigation *and*

24  unreasonably failed to provide adequate information to his experts.  Lewis was

25  therefore deficient.

26  ───────────────

27      [9]   Exhibit B was filed concurrently with Anderson's opening brief.

28      [10]  Anderson also filed Exhibit A with his opening brief.

1

2

3

4

     **b.**    **Lewis could have presented evidence that Anderson was brain damaged and suffered from a serious mental illness, and there is a reasonable probability that this evidence would have affected the result of this case.**

5

6

7

8

9

10

11

12

13

14

     As noted above, in his opposition Respondent remarks that it was not until 1997 that Anderson was first diagnosed as being brain damaged.  (Resp. Br. at 40.)  This fact highlights the basis of Anderson's ineffectiveness claims.  As demonstrated above, Lewis was deficient in his mental health investigation.  (*See also* Ex. 35, Dr. Globus Decl., at 45 (explaining that Anderson "was never properly evaluated at trial either from a personality point of view or a neuropsychiatric point of view").)  And as explained below in Claim Sixteen, trial counsel at Anderson's penalty retrial was also deficient in his mental health investigation.  Since both trial attorneys failed to conduct adequate investigations in1979 and 1990-91, respectively, it is unsurprising that there is no report from those periods of time.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     By contrast, in 1997 Anderson's state habeas counsel ensured that Anderson was adequately evaluated.  Significantly, unlike the evaluations by Drs. Coburn and Lawrence, Anderson's evaluations during his habeas proceedings consisted of the following tests, conducted against the backdrop of a full social history:  an Adult Neuropsychological History and Interview; Halstead-Reitan Neuropsychological Battery Aphasia Screening Test; Category Test; Finger Tapping; Reitan-K Love Sensory Perceptual  Examination Seashore Rhythm Test; Speech Sounds Perception Test Tactual Performance Test; Controlled Oral Word Test Grooved Pegboard; Memory Assessment Scales Portland Digit Recognition Test; Rey Osterrierth Complex Figure (with 30 minute delay); Smell Identification Test ;Wechsler Adult Intelligence Scale-Revised Wisconsin Card Sorting Test; Woodcock Johnson Psycho-Educational l Battery (selected subtests); Minnesota Multiphasic Personality Inventory-2; Millon Clinical Multiaxial Inventory-II; Sentence Completion Test; Thematic Appreciation Test; and a Rorshach Inkblot Test.  (Ex. 37, Dr.  Riley Decl., ¶ 9; Ex. 41, Dr. Wicks

Decl., ¶ 9.)  The evaluations took place over multiple hours, and, in some instances, over multiple days.  (Ex. 35, Dr. Globus Decl. at 5 (examined Anderson for three hours); Ex. 37, Dr. Riley Decl. ¶ 8 (examined Anderson over a two-day period); (Ex. 41, Dr. Wicks Decl., ¶ 8 (examined Anderson over a two-day period).)

This is what was revealed after Anderson finally received an adequate mental health examination based on an adequate investigation:

- Psychiatrist Dr. Albert Globus diagnosed Anderson with brain damage and chronic paranoid schizophrenia.  (Ex. 35, Dr. Globus Decl., at 34, 52.)

- Neuropsychologist Dr. Nell Riley diagnosed Anderson with neurocognitive deficits and a severe mental disorder.  (Ex. 37, Dr. Riley Decl., ¶¶ 21-23.)

- Psychologist John Wicks diagnosed Anderson with paranoid schizophrenia. (Ex. 41, Dr. Wicks Decl., ¶ 16.)

- Physician Dr. Sterling Clarren diagnosed Anderson with brain damage.  (Dr. Ex. 108, Dr. Clarren Letter, at 3.)

- Psychologist Dr. Amanda Gregory diagnosed Anderson with mild to moderate neurocognitive deficits suggestive of brain damage and a major mental disorder.  (Ex. 110, Dr. Gregory Decl., ¶ 43.)

- Psychiatrist Dr. Nathan Lavid diagnosed Anderson with a psychotic disorder due to brain damage, with delusions.  (Ex. 112, Dr. Lavid Decl., ¶¶ 4, 16.)

These findings stand in stark contrast with those of Anderson's trial experts, and for good reason.  These findings, unlike the trial experts' findings, were based on an informed foundation and employed standard tests used by experts.  (*See* Ex. 35, Dr. Globus Decl., at 58 (concluding that Anderson "was deprived of a mental assessment comporting with the customary and usual practice of forensic psychiatrists assessing such a complex and serious case by the absence at both trials of thorough mental testing and evaluation of brain function and the mental deficits characteristic of schizophrenia").

What is more, Anderson's post-conviction experts unanimously agree that Anderson's symptoms predate both the crime and his trials:

- Dr. Globus notes in his declaration that Anderson's developmental difficulties can be seen in Anderson's childhood foster records (Ex. 35, Dr. Globus Decl., at 6, 10), and his review of Anderson's records gave him "ample reason to believe [Anderson's] behavior and personality and the charged offenses are the direct result of [Anderson's] brain damage and/or psychosis. (*Id.* at 34.) And "[w]hile it is impossible to fix a date of onset, it is accepted in psychiatric literature that [the] abnormalities [seen in Anderson's test results] have a very early onset long before the appearance of clinically detectible signs and symptoms of psychosis." (*Id.* at 36.) Dr. Globus also opined that Anderson's brain damage could be related to several serious head traumas Anderson suffered as a young adult in the early-mid 1970s. (*Id.* at 41.)

- While Dr. Riley is uncertain of the "exact etiology or origin" of Anderson's cognitive limitations, he believes that perinatal abnormalities, birth complications, and several incidents of head trauma, all of which predate the crime and trial, "could certainly have contributed to or exacerbated pre-existing neuropsychological vulnerabilities." (Ex. 37, Dr. Riley Decl., ¶ 22.)

- Dr. Wicks diagnosed Anderson with paranoid schizophrenia, a genetically-based mental illness that typically manifests itself in men during their early 20s. Anderson was 25 at the time of the crimes. (*See* Tr1 CT 4A; Ex. 2, Birth Certificate of Petitioner, James Phillip Anderson born Robert Allen Craft aka Robert Lauderdale, 1953.)

- Dr. Clarren believes that Anderson's brain damage "could be due to either or both prenatal genetic or teratogenic causes." (Ex. 108, Dr. Clarren Decl., at 3.)

- Dr. Gregory opines that "risk factors for and indicators of brain damage" date back to Anderson's perinatal history. (Ex. 110, Dr. Gregory Decl., ¶ 44.) She

34

also opines that significant head injuries during Anderson's early adulthood can explain the etiology of Anderson's brain damage.  (*Id.* ¶ 45.)

- Dr. Jinich states that "[o]ne of the exogenous factors contributing to Mr. Anderson's Psychosis is that he has an extensive history of head trauma." (Ex. 111, Dr. Jinich Decl., ¶ 13.)  Another "notably exogenous factor contributing to Mr. Anderson's psychosis is his exposure to drugs and alcohol" as an adolescent and young adult, as well as possible in utero exposure to alcohol.  (*Id.* ¶ 14.)

So although it was not until 1997 that an expert first conclusively diagnosed Anderson with brain damage and a serious mental illness, these mental health issues were discoverable at the time of trial.  Indeed, with an adequate investigation and evaluation, Lewis could have presented at trial the same mental health evidence Anderson attached to his state habeas petition.  And, as explained in Anderson's brief, there is a reasonable probability that the result of this case would have been different had the jury been made aware of this evidence.  (Pet. Br. at 79-82 (explaining prejudicial impact of Lewis's failures in his mental health investigation).)  Respondent offers no evidence suggesting otherwise.

### 3.     Lewis was ineffective for not adequately moving to exclude Anderson's pretrial statements (Claim One.B.3).

Respondent asserts that Anderson "has not provided any evidence how his waiver might have been involuntary or unknowing in any sense."  (Resp. Br. at 45.) Respondent also argues that "[t]here was no evidence on the record that Anderson had mental disabilities, lacked the capacity to understand his Constitutional rights or that he was unable to completely unable to perceive and recollect events."  (Resp. Br. at 45.) The record indicates otherwise.

Through expert declarations, Anderson demonstrates in his opening brief that he had serious mental illnesses and impairments that existed at the time of trial.  (*See* Ex. 35, Dr. Globus Decl., at 34,  52 (brain damage and chronic paranoid schizophrenia);

35

Ex. 37, Riley Decl., ¶¶ 21-23 (neurocognitive deficits; severe mental disorder); Ex. 41, Dr. Wicks Decl., ¶ 16 (paranoid schizophrenia); Ex. 108, Dr. Clarren Letter, at 3 (brain damage); Ex. 110, Dr. Gregory Decl., ¶ 43 (mild to moderate neurocognitive deficits suggestive of brain damage; major mental disorder); Ex. 112, Dr. Lavid Decl., ¶¶ 4, 16 (psychotic disorder due to brain damage, with delusions).)  His pretrial statements were involuntary because they were a product of these mental illnesses and impairments. (Pet. Br. at 88 (citing Ex. 35, Dr. Globus Decl., at 45-46, 47, & 52).)  These same illnesses and impairments rendered Anderson unable to voluntarily and knowingly waive his *Miranda*[11] rights.

Also, Respondent fails to address the prejudice prong of the *Strickland* test here. That failure constitutes a waiver of any argument that Anderson was not prejudiced by trial counsel's deficient performance.  *Ewing*, 638 F.3d at 1230; *Bland*, 20 F.3d at 1474.

**4.     Lewis was ineffective because he inadequately advised Anderson about the implications of testifying and failed to minimize the damage caused by Anderson's pretrial statements (Claim One.B.4).**

In his opening brief, Anderson argues that Lewis was deficient for not properly advising Anderson of the risks involved with testifying, for not challenging Anderson's competency to testify, and for not using Anderson's mental impairments and illnesses to explain away any inconsistencies or discrepancies in Anderson's testimony.  (Pet. Br. at 94-95.)  Respondent addresses only one of these theories: trial counsel was deficient for not challenging Anderson's competency to testify.  (Resp. Br. at 47.) Respondent has waived any argument as to the theories he did not address.  *Ewing*, 638 F.3d at 1230; *Bland*, 20 F.3d at 1474.

---

[11] *Miranda v. Arizona*, 384 U.S. 436 (1966).

1        Respondent's arguments as to the one theory he addresses are unpersuasive.  As

2   he did in relation to the claim above, Respondent argues that "[t]here was no evidence

3   on the record that Anderson had mental disabilities, lacked the capacity to testify or that

4   he was completely unable to perceive and recollect events."  (Resp. Br. at 47.)

5   Respondent is wrong.  (*See* Ex. 35, Dr. Globus Decl., at 34, 52 (brain damage and

6   chronic paranoid schizophrenia); Ex. 37, Riley Decl., ¶¶ 21-23 (neurocognitive deficits;

7   severe mental disorder); Ex. 41, Dr. Wicks Decl., ¶ 16 (paranoid schizophrenia); Ex.

8   108, Dr. Clarren Letter, at 3 (brain damage); Ex. 110, Dr. Gregory Decl., ¶ 43 (mild to

9   moderate neurocognitive deficits suggestive of brain damage; major mental disorder);

10  Ex. 112, Dr. Lavid Decl., ¶¶ 4,16 (psychotic disorder due to brain damage, with

11  delusions).)

12       Respondent also overemphasizes the importance of the trial experts' findings.

13  (Resp. Br. at 47 ("the mental health experts retained by the defense did not indicate that

14  Anderson suffered any organic brain disorder and found Anderson to be of average

15  intelligence").)  This Court should give more weight to the findings from Anderson's

16  post-conviction proceedings, which, unlike the trial experts' findings, are based on an

17  adequate foundation.  (*See* Ex. 35, Dr. Globus Decl., at 39 (explaining that "[p]revious

18  psychiatric and psychological evaluations, including those administered in

19  [Anderson's] youth, in trial preparation, and by prison staff have been seriously and

20  surprisingly superficial, inadequate and perhaps incompetent.  They fall far short of the

21  level of professional expertise such a case warrants.").)

22       Finally, Respondent's argument about prejudice centers on his mistaken belief

23  that trial counsel would have been unable to successfully pursue a lingering doubt

24  defense had Anderson not testified.  (Resp. Br. at 47.)  But given the contradictions in

25  Fred's testimony, the flaws in Sheila's diminished capacity defense, and the evidence

26  linking Fred to the crimes—including Fred's admission that he was present in the

27  orange grove when the women were killed and his possession of a piece of rope similar

28

1    to the one used to kill the victims—there is a reasonable probability that the result of

2    the trial would have been different had Lewis not been deficient.

3    **J.      This Court should grant habeas relief because the 987 judge violated**

4    **California Penal Code section 987 (Claim Four).**

5           There is no dispute that the 987 judge, Judge Marsh, violated California Penal

6    Code section 987 by discussing Anderson's 987 application with the other judges in his

7    courthouse, including Judge Moore, who presided over Anderson's trial.  (*See* Resp.

8    Br. at 50 ("The CSC agreed with Anderson that the confidentiality requirement of Cal.

9    Penal Code § 987.9 was violated.").)  That holding is entitled to deference.  *See*

10   *Bradshaw v. Ritchey*, 546 U.S. 74, 76 (2005) (per curiam) ("We have repeatedly held

11   that a state court's interpretation of state law, including one announced on direct appeal

12   of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also*

13   *Johnson v. Williams*, 133 S. Ct. 1088, 1094-95 (2013) (explaining that a state court will

14   often feel no need to rule expressly on a federal claim because "a line of state precedent

15   is viewed as fully incorporating a related federal constitutional right . . . [and the] state

16   appellate court may regard its discussion of the state precedent as sufficient to cover a

17   claim based on the related federal right").

18          Since the parties agree that Judge Marsh violated section 987, the sole question

19   for this Court is whether this error amounted to reversible constitutional error.

20   Respondent asserts that there is no clearly established federal law for this claim.  (Resp.

21   Br. at 48.)  He is wrong.  As detailed in Anderson's amended petition, the clearly

22   established federal law for this claim is, inter alia, *Tumey v. Ohio*, 273 U.S. 510, 535

23   (1927), which guaranteed Anderson the right to an impartial judge, and *Hicks v.*

24   *Oklahoma*, 447 U.S. 343, 346 (1980), which held that a defendant has a "substantial

25   and legitimate expectation that he will be deprived of his liberty" in accordance with a

26   state statutory scheme, and the arbitrary deprivation of that right violates the Due

27   Process Clause.  This Court should reject Respondent's attempt to characterize this

28   claim as nothing more than a state-law claim.  *See Fetterly v. Paskett*, 997 F.2d 1295,

38

1    1300 (9th Cir. 1993) ("To paraphrase *Hicks* . . . , where a state has provided a specific

2    method for the determination of whether the death penalty shall be imposed, 'it is not

3    correct to say that the defendant's interest' in having that method adhered to 'is merely

4    a matter of state procedural law.'") (quoting *Hicks*, 447 U.S. at 346).

5         Although neither *Tumey* nor *Hicks* directly deals with California Penal Code

6    section 987, "AEDPA does not 'require state and federal courts to wait for some nearly

7    identical factual pattern before a legal rule must be applied.'" *Panetti v. Quarterman*,

8    551 U.S. 930, 953 (2007) (quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006)

9    (Kennedy, J., concurring in judgment)).  "Nor does AEDPA prohibit a federal court

10   from finding an application of a principle unreasonable when it involves a set of facts

11   'different from those of the case in which the principle was announced.'" *Id.* (quoting

12   *Lockyer v. Andrade,* 538 U.S. 63, 76 (2003)).  "The statute recognizes, to the contrary,

13   that even a general standard may be applied in an unreasonable manner." *Id.*

14        The record here cannot, under any reasonable interpretation of the controlling

15   legal standards, support the California Supreme Court's legal ruling.  Beginning first

16   with *Hicks*, that case held that the Due Process Clause "prevents a state court from

17   denying an isolated defendant the benefit of a state law that applies to everyone else."

18   *Fetterly v. Paskett*, 15 F.3d 1472, 1475 (9th Cir. 1994), as amended (Mar. 8, 1994).  As

19   noted above, Anderson was denied the benefit of a state law—the ability to keep his

20   987 requests confidential—even though that benefit applied to everyone else.  Judge

21   Marsh's violation of this statute forced Anderson's defense counsel to seek a remedy in

22   open court, which allowed the prosecution information that it would not otherwise have

23   been able to discover.  Assuming *Brecht* applies to this claim, Anderson has satisfied

24   that standard.  (*See* Am. Pet. at 80-81.)

25        Regarding the judicial bias component of this claim, it is important to clarify two

26   points.  First, Anderson does not have to demonstrate that the disclosure of the

27   application to Judge Moore resulted in Judge Moore becoming actually biased.  (*See*

28   Resp. Br. at 50 ("[T]here is no evidence in the record that Judge Marsh's consultation

1 biased the trial judge in any way against Anderson.").)  To succeed on a judicial bias

2 claim, a petitioner can show that a judge was actually biased *or* that circumstances

3 created the "appearance of bias."  *In re Murchison*, 349 U.S. 133, 136 (1955)

4 (observing that the Due Process Clause "may sometimes bar trial by judges who have

5 no actual bias and who would do their very best to weigh the scales of justice equally

6 between contending parties" because "to perform its high function in the best way,

7 'justice must satisfy the appearance of justice'").  Anderson at least meets this latter

8 standard.  (Pet. Br. at 96-97.)  Second, contrary to what Respondent suggests (*see* Resp.

9 Br. at 51), *Brecht* does not apply to the judicial bias component of this claim; a biased

10 judge creates a structural error in the judicial process that requires automatic reversal.

11 *Tumey*, 273 U.S. at 535.

12 **K.    This Court should grant habeas relief because Anderson was**

13 **incompetent at trial (Claim Five).**

14       Respondent does not challenge the veracity of Anderson's supporting expert

15 declarations.  (Resp. Br. at 51-55.)  Respondent does, however, contend that "Anderson

16 has not alleged any facts showing how his alleged illnesses hindered his ability to

17 consult with his lawyer or understand the proceedings against him."  (Resp. Br. at 53.)

18 But Anderson included these allegations in his petition.

19       • 222. At the time of trial, James Phillip Anderson suffered from severe

20          mental illness and impairments.  As a result, he lacked "'sufficient present

21          ability to consult with his lawyer with a reasonable degree of rational

22          understanding' and 'a rational as well as factual understanding of the

23          proceedings against him.'"  *Godinez v. Moran*, 509 U.S. 389, 396, 113 S.

24          Ct. 2680, 125 L. Ed. 2d 321 (1993) (quoting *Dusky v. United States*, 362

25          U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam)); *see also*

26          *Drope v. Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103

27          (1975).

28

40

- 230. . . . Anderson's impairments and illnesses affected his ability to rationally understand what was going on.  His perspective on reality was seriously impaired, at least partly due to uncontrollable paranoia and ideation.

- 231. These impairments and illnesses also had an adverse effect on Anderson's ability to rationally consult with his attorneys.

(Am. Pet. at 82-84.)

Respondent also asserts that "Anderson presents no arguments or evidence showing he was unable to assist in his defense or understand the proceedings against him."  (Resp. Br. at 54.)  Not true.  The expert declarations Anderson provided in support of his claim indicate that Anderson's mental illnesses and impairments seriously impair Anderson's ability to perceive and understand the world around him today.  (*See* Ex. 35, Dr. Globus Decl., at 34, 52 (brain damage and chronic paranoid schizophrenia); Ex. 37, Riley Decl., ¶¶ 21-23 (neurocognitive deficits; severe mental disorder); Ex. 41, Dr. Wicks Decl., ¶ 16 (paranoid schizophrenia); Ex. 108, Dr. Clarren Letter, at 3 (brain damage); Ex. 110, Dr. Gregory Decl., ¶ 43 (mild to moderate neurocognitive deficits suggestive of brain damage; major mental disorder); Ex. 112, Dr. Lavid Decl., ¶¶ 4, 16 (psychotic disorder due to brain damage, with delusions).)  Since these mental illnesses and impairments predate his trial, it follows that they would have affected him at trial in a similar manner as they affect him today.

**L.    This Court should grant habeas relief because the trial court failed to conduct sequestered voir dire (Claim Six).**

Respondent tacitly concedes that this claim is not subject to harmless error analysis.  (*See* Resp. Br. at 55-56.)   Indeed it is.  Supreme Court case law makes clear that when a trial court fails to conduct voir dire in a manner that comports with the Due Process Clause, reversal is automatic.  *See, e.g.*, *Ham v. South Carolina*, 409 U.S. 524, 529 (1973) (automatically reversing judgment based on trial court's failure to ask prospective jurors about racial bias).  Thus, the only question this Court must resolve is

41

1   whether the standards employed by the trial court here violated Anderson's due process

2   rights.  *See Ristaino v. Ross*, 424 U.S. 589, 595 n.6 (1976) (citing *Irvin v. Dowd*, 366

3   U.S. 717, 722 (1961)).

4        While there is no single way to conduct voir dire, a court must nevertheless

5   ensure that voir dire comports with "essential demands of fairness."  *Ham*, 409 U.S. at

6   526.  In his petition and opening brief, Anderson explains in detail why sequestered

7   voir dire is necessary and constitutionally compelled.  (Am. Pet. 85-89.)  In his

8   opposition brief, Respondent does not meaningfully address those arguments, and

9   instead simply asserts that no case indicates "that sequestered voir dire is compelled by

10  existing Supreme Court precedent."  (Resp. Br. at 56.)  But cases like *Ham*, *Ristiano*,

11  and *Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991) (listing other due process cases

12  involving challenges to voir dire procedures), establish a general due process standard

13  that applies to voir dire, and that standard, though general, may still be applied

14  unreasonably.  *See Panetti*, 551 U.S. at 953.  Anderson does not repeat his arguments

15  here as to why the trial court's procedures here fell short of constitutional protections,

16  but instead respectfully refers the Court to his amended petition which explains why

17  sequestered voir dire is constitutionally compelled.  (*See* Am. Pet. at 85-89.)

18  **M.    This Court should grant habeas relief because the trial court**

19          **erroneously excluded potential jurors in violation of *Witherspoon v.***

20          ***Illinois* (Claim Seven).**

21        Respondent applies the wrong standard to this claim.  Respondent correctly

22  identifies *Anderson I* as the relevant state-court decision that this Court should review.

23  (Resp. Br. at 57.)  Yet, he maintains that § 2254(d) applies here.  (*Id.*)  This argument

24  rests on a strained and unsupportable interpretation of Anderson's direct appeal

25  proceedings.

26        On direct appeal, Anderson raised three challenges to the jury selection

27  proceedings.

28

- The court's apportionment of peremptory challenges was unconstitutional. (Lodged Document (LD) 103 at 16-17.)
- The court failed to allow sequestered voir dire (this is now Claim Six in Anderson's amended petition).  (LD 98 at 37-44.)
- The court improperly excused four jurors under *Witherspoon* (this is now Claim Seven).  (LD 98 at 44-54.)

In its direct appeal opinion, the California Supreme Court addressed only "two contentions that related to the selection of the jury": Anderson's claim that "the court's apportionment of peremptory challenges . . . was constitutionally impermissible" and the aforementioned Claim Six.  *Anderson I*, 43 Cal. 3d at 1134-36.  Nowhere in the section of its opinion titled "Jury-selection Issues" does the California Supreme Court address the *Witherspoon* claim.  *Id.*  In fact, the court does not cite *Witherspoon* anywhere in its opinion.  Pointing to footnote 6 of *Anderson I*, Respondent contends that the California Supreme Court rejected this claim in its "discussion of jury issues." (Resp. Br. at 57.)  But footnote 6 relates exclusively to Claim Six.  *See Anderson I*, 43 Cal. 3d at 1135 n.6  ("Defendant claims the open-court voir dire resulted in making the jurors more guilt and death-penalty prone.").

There is thus no reasonable argument that the California Supreme Court decided this claim.  Because the court failed to address a claim properly presented to it, this Court reviews the claim de novo.  *See Lafler v. Cooper*, 132 S. Ct. 1376, 1390 (2012) (finding de novo review under *Strickland* was warranted in part because "the state court [only] made . . . irrelevant observation[s] and mischaracterized respondent's claim"); *see also Rankin v. Palmer*, 2015 WL 5638016, *2 (9th Cir. Sept. 25, 2015) (unpublished) ("The state court misunderstood Rankin's claim . . . . Thus we agree with the district court that the state court did not decide the issue on the merits (or if it did, it applied federal law unreasonably); therefore, we examine de novo Rankin's claim").  Respondent is therefore wrong that this Court analyzes this claim under § 2254(d). (Resp. Br. at 57 & 59.)

43

Under de novo review, Anderson is entitled to habeas relief.  A State violates the impartial jury requirement if it attempts to "execute a death sentence imposed by a jury culled of all those who revealed during *voir dire* examination that they had conscientious scruples against or were otherwise opposed to capital punishment." *Adams v. Texas*, 448 U.S. 38, 43 (1980) (explaining *Witherspoon v. Illinois*, 391 U.S. 510 (1968)).  In violation of this constitutional mandate, Anderson's jury was culled in a way that resulted in a jury that was impermissibly prone to returning a death verdict. His opening merits brief provides the example of prospective juror Corinne Bjerke, whom the trial court improperly removed for cause in violation of *Witherspoon*.  (Pet. Br. at 101-02.)  Significantly, Respondent does not attempt to justify Bjerke's exclusion, tacitly conceding that the trial court did in fact erroneously exclude her. (Resp. Br. at 57-59.)  Since the trial court erroneously excluded Bjerke, automatic reversal is warranted.  *See Gray v. Mississippi*, 481 U.S. 648, 665 (1987) (constitutional error in jury selection requires reversal if it changes the composition of the jury).

**N.    This Court should grant habeas relief because the prosecutor violated *Brady v. Maryland* by not turning over exculpatory evidence (Claim Ten).**

> **1.    Either the prosecutor never turned over the results of Fred's polygraph test or the prosecutor never administered the test. Under either scenario, the prosecutor committed egregious misconduct that undermines the fairness of Anderson's trial and the reliability of his convictions.**

During the preliminary hearing and at trial, the prosecutor told the court he had administered a polygraph test on Fred Anders.  (Prelim. Hearing RT 4-5 (1979-03-23); Tr1 RT 222.)  Though trial counsel Michael Lewis stated that he had "heard the tape recording of [Fred's] polygraph examination" (Prelim. Hearing RT 4), Anderson himself has never heard the tape nor received a copy of the polygraph test results.  He has made repeated efforts to locate these results, but has so far been unsuccessful.

44

For instance, during his initial state habeas proceedings, Anderson's state habeas counsel contacted the trial prosecutor to inquire about the polygraph test.  The prosecutor's response, dated August 28, 1997, is as follows:

> Unfortunately, while I do remember many aspects of the Anderson case very well, I have no recollection of having had a polygraph examination administered to Mr. Fred Anders.  I don't doubt at all your representation, of the accuracy of the partial transcript, you provided reflecting that I had stated to Judge Moore that one was given.  And, if I said we did have one administered, I'm sure we did.  I just presently have no recollection of it.

(Ex. 44, Douglas Ltr. at 352.)[12]  The trial prosecutor suggested that because an individual named Marshall Gaines and the Riverside Sheriff's Department were administering polygraph test results around the time of trial, Anderson's state habeas counsel should follow-up with them.  (*Id.*)

State habeas counsel did so.  As explained in a letter dated September 25, 1997, Gaines informed Anderson's state habeas counsel that he had "no record of administering a polygraph test to Fred Anders, though on June 14, 1979 he administered a polygraph test (at the request of her attorney) to Anderson's co-defendant Sheila Anders, who was also Fred Anders' sister." (*Id* at 355.)  He also "stated that any such test of Fred Anders was likely performed either by the California Department of Justice (DOJ) or by the Riverside Sheriff." (*Id.*)

At Gaines' instruction, state habeas counsel followed-up with both of those entities.  The DOJ's "polygraph section" informed state habeas counsel that they had

---

[12] This letter, and all correspondence related to this *Brady* request, were submitted as Exhibit 44 to Anderson's First Amended Petition (FAP).  At Anderson's request, counsel is attaching that exhibit to this brief as well.

45

"no record of administering Fred Anders' polygraph test." (*Id.* at 356.)  In correspondence dated November 17, 1997, the Sheriff's Department informed state habeas counsel that it had no records of the test either:

> Pursuant to your request, we have done what was possible [sic] reference this matter.  We had two people doing polygraphs during the time period you requested.  One is deceased and the other is retired.  We made contact with the retired employee who is elderly and has no recollection of the polygraph your [sic] interested in.  We checked for some records and found that the records for that time period were destroyed years ago per Department policy.

(*Id.* at 357)

Thus, though the trial prosecutor orally claimed to have given Fred Anders a polygraph test, which Fred allegedly passed, the foregoing indicates that there is no record or evidence of a polygraph test ever being administered on Fred.  The missing polygraph test either was not disclosed to Anderson, or never existed, despite the prosecutor's contrary representation.

If the prosecution did indeed fail to turn over the polygraph test, then that would amount to, at least, a prima facie *Brady* violation.  *See Brady*, 373 U.S. at 87; *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  If the prosecution never administered the test, despite telling the court otherwise, then his false representation would amount to egregious misconduct.  *See Napue*, 360 U.S. at 269.

### 2. Anderson has established a *Brady* violation.

In his opening brief, Anderson analogized his situation to that of the petitioners in *Carter v. Rafferty*, 826 F.2d 1299, 1309 (3d Cir. 1987), and *Jacobs v. Singletary*, 952 F.2d 1282, 1289 (11th Cir. 1992), two cases in which circuit courts granted relief based on a prosecutor's failure to turn over polygraph test results.  Respondent, in his

1    opposition, does not address these cases.  They compel relief here for the reasons

2    explained in Anderson's brief.  (Pet. Br. at 103-05.)

3         The authority Respondent relies on is inapposite.  Citing *Wood v. Bartholomew*,

4    516 U.S. 1, 6 (1995) (per curiam), he argues that the United States Supreme Court held

5    that polygraph test results are not "material under *Brady* because California prohibits

6    admission of polygraph tests."  (Resp. Br. at 61.)  But that was not the Supreme Court's

7    holding in *Wood*.  That decision is a federal habeas case arising out of the State of

8    Washington, and it turned on Washington state law, not California state law.

9         Respondent also argues that, under California Evidence Code section 351.1 and

10   *People v. Sapp*, 31 Cal. 4th 240, 299 (2003), California prohibits admission of

11   polygraph tests.  (Resp. Br. at 62.)  These authorities are not on point.  California

12   Evidence Code section 351.1 did not become effective until July 12, 1983, more than

13   four years after Anderson's trial.  And *Sapp*, a 2003 California Supreme Court decision,

14   interprets that statute.  Contrary to what Respondent argues, at the time of Anderson's

15   trial there was not a per se rule barring admission of polygraph results.  If all parties

16   stipulated to the admission of polygraph test results, then the court could enter those

17   results into evidence.  *People v. Adams*, 53 Cal. App. 3d 109, 119 (1975) (relying on

18   *People v. Carter*, 48 Cal. 2d 737 (1957)).

19        Lastly, Respondent incorrectly states that Anderson must satisfy *Brecht* here.

20   *Brecht*, however, does not apply to *Brady* claims made on habeas.  *See Kyles*, 514 U.S.

21   at 435; *Jackson*, 513 F.3d at 1070.

22   **O.   This Court should grant habeas relief on Anderson's *Ake* claim (Claim**

23   **        Fourteen).**

24        Respondent misunderstands the premise of Anderson's *Ake*[13] claim.  Respondent

25   argues that "Anderson fails to provide any evidence how the amount authorized by the

26

27   _____

28        [13]  *Ake v. Oklahoma*, 470 U.S. 68 (1985).

1   trial court for his 1979 [sic] was insufficient, or that he requested any additional

2   funding or mental examinations." (Resp. Br. at 64.)  But Anderson's claim proceeds

3   not on a denial-of-funding premise, but on the premise that *Ake* guarantees a defendant

4   "'access to a competent psychiatrist who will conduct an *appropriate* examination.'"

5   (Am. Pet. at 140 (quoting *Ake*, 470 U.S. at 83).)  Anderson's claim further alleges that

6   Anderson did not receive an "appropriate examination" because trial counsel failed to

7   provide Anderson's experts with the necessary information to render an informed

8   opinion, and the State failed to ensure that these experts were properly prepared.  (*Id.* at

9   140-41.)

10          Significantly, one of Anderson's habeas experts reviewed the examinations that

11  were provided to Anderson at trial and concluded that they fell short of professional

12  standards:

13                 [Anderson] was deprived of a mental assessment comporting

14                 with the customary and usual practice of forensic psychiatrists

15                 assessing such a complex and serious cases by the absence at

16                 both trials of thorough mental testing and evaluation of brain

17                 function   and   the   mental   deficits   characteristic   of

18                 schizophrenia.

19  (Ex. 35, Dr. Globus Decl., at 58.)  Other supporting facts for this claim are laid out in

20  Anderson's amended petition, and Respondent fails to directly challenge those facts in

21  his opposition brief.  (*See* Resp. Br. at 62-64.)

22  **P.     This Court should grant habeas relief because the California Supreme**

23  **Court arbitrarily deprived Anderson of an instruction it routinely**

24  **provided to other similarly-situated capital defendants (Claim**

25  **Fifteen(B)).**

26          Respondent argues that this claim is "principally based on state law."  (Resp. Br.

27  at 66.)  Although this claim asserts that, under *Carlos v. Superior Court*, 35 Cal. 3d 131

28  (1983), the trial court should have instructed the jury that an intent-to-kill requirement

48

1    applied to the felony-murder and multiple-murder special circumstances, it is

2    inappropriate to characterize this claim as a state law claim that is non-cognizable on

3    federal habeas.  (Resp. Br. at 66.)  This claim asserts due process and equal protection

4    violations based on the State's failure to apply *Carlos* to this case.  (Am. Pet. at 143-48

5    (citing, inter alia, *Hicks*, 447 U.S. at 346).)  Accordingly, it is cognizable on federal

6    habeas.

7            The precise constitutional violations asserted here are well-established.  As noted

8    above, in *Hicks* the Supreme Court explained that a defendant's "liberty interest is one

9    that the Fourteenth Amendment preserves against arbitrary deprivation by the State."

10   *Hicks*, 447 U.S. at 346.  Notably, a state court's arbitrary treatment of a person can be

11   the basis of a due process or an equal protection violation.  *See id.* (an "arbitrary

12   disregard of the petitioner's right to liberty is a denial of due process of law");

13   *Chapman v. United States*, 500 U.S. 453, 465 (1991) (stating that the Due Process

14   Clause precludes the imposition of punishment based on arbitrary distinctions, which

15   "essentially duplicates" an argument based on the Equal Protection Clause); *Myers v.*

16   *Ylst*, 897 F.2d 417, 421 (9th Cir. 1990) ("[T]he equal protection clause prohibits de

17   facto as well as explicit, or open, unequal and arbitrary treatment.").

18          It is deeply troubling that the California Supreme Court refused to reverse

19   Anderson's convictions based on the aforementioned *Carlos* error even though it

20   reversed the convictions of similarly-situated defendants.  The crimes in this case

21   occurred in 1979, the California Supreme Court decided *Carlos* in 1983, and then the

22   court overruled *Carlos* in *Anderson I* in 1987.  Between 1983 and 1987, the California

23   Supreme Court routinely set aside special circumstance findings in capital cases where

24   the defendants, like Anderson, were tried for murders that occurred pre-*Carlos*.  *See,*

25   *e.g.*, *People v. Ratliff*, 41 Cal. 3d 675 (1986); *People v. Silberston*, 41 Cal. 3d 296

26   (1985); *People v. Hamilton*, 41 Cal. 3d 408 (1985); *People v. Fuentes*, 40 Cal. 3d 629

27   (1985); *People v. Turner*, 37 Cal. 3d 302 (1984); *People v. Whitt*, 36 Cal. 3d 724 (1984)

28   *People v. Guerra*, 40 Cal. 3d 377 (1985); *People v. Hayes*, 38 Cal. 3d 780 (1985);

1  *People v. (Stephen) Anderson*, 38 Cal. 3d 58 (1985); *People v. Garcia*, 36 Cal. 3d 539

2  (1984); *People v. Ramos*, 37 Cal. 3d 136 (1984).

3         Yet, when Anderson's case came before the California Supreme Court, he was

4  denied relief under *Carlos* even though the California Supreme Court provided that

5  relief to handfuls of other similarly-situated defendants.  The California Supreme Court

6  never justified its disparate treatment of Anderson, nor did it explain why it was

7  depriving him of a right he was entitled to under state law.  Respondent's opposition

8  fails in the same regard.  For these reasons, the California Supreme Court's failure to

9  fairly and equally apply the law to Anderson constituted a violation of his rights under

10  the Fourteenth Amendment's Due Process and Equal Protection Clauses.  *See Hicks*,

11  447 U.S. at 346; *Myers*, 897 F.2d at 421.

12  **Q.   This Court should grant habeas relief on Anderson's remaining**

13        **ineffectiveness claims (Claim One.C).**

14        **1.   Governing standards**

15         The parties agree as to the governing standard of review for Anderson's

16  remaining ineffectiveness claims.  This Court reviews de novo Anderson's claims that

17  trial counsel unreasonably failed to:  (1) adequately move to sever Anderson's trial, (2)

18  take reasonable steps to ensure that Anderson was tried by an impartial jury, and (3)

19  make an adequate closing argument.  (Pet. Br. at 107; Res. Br. at 68.)  By contrast,

20  Anderson's claim that trial counsel was ineffective for not adequately challenging

21  Fred's alleged polygraph test is subject to § 2254(d).  (*Id.*)

22         The parties disagree, however, as to whether, in analyzing Anderson's *Strickland*

23  claims, this Court cumulates trial counsel's errors and the resulting prejudice from

24  those errors.  Respondent asserts that "[t]here is no clearly established United States

25  Supreme Court precedent as to whether *Strickland* calls for a cumulative error

26  analysis."  (Resp. Br. at 73.)  But there is.  In its foundational ineffectiveness case, the

27  Supreme Court cumulated errors.  *See Strickland*, 466 U.S. at 693 (explaining that a

28  petitioner must show that the "particular errors"—plural—of counsel "had an adverse

50

1   effect on the defense").  Furthermore, the Supreme Court routinely cumulates errors

2   and prejudice.  *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 390-91 (2005) (considering

3   the cumulative prejudice of trial counsel's failure to present various types of mitigation

4   evidence); *Wiggins*, 539 U.S. at 534 ("[P]etitioner must show that counsel's failures

5   prejudiced his defense."); *Williams*, 529 U.S. at 398-99 (holding that the state trial

6   judge correctly concluded "that the entire postconviction record, viewed as a whole

7   and cumulative of mitigation evidence presented originally, raised 'a reasonable

8   probability that the result of the sentencing proceeding would have been different' if

9   competent counsel had presented and explained the significance of all the available

10  evidence").

11        Binding Ninth Circuit law also requires this Court to cumulate errors and

12  prejudice in a *Strickland* analysis.  *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir.

13  2005) (explaining that prejudice may result from the cumulative impact of multiple

14  deficiencies); *Harris v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) ("By finding

15  cumulative prejudice, we obviate the need to analyze the individual prejudicial effect of

16  each deficiency.").

17        **2.    Lewis was ineffective.**

18        The opposition merits a response to only two of Anderson's remaining

19  ineffectiveness claims.

20        First, Respondent misunderstands Anderson's claim that Lewis failed to

21  adequately move to sever his trial from Sheila's.  Respondent frames the issue as

22  whether counsel "was ineffective by not moving to sever the joint trial with Sheila."

23  (Resp. Br. at 69.)  That allows Respondent to disprove this claim by showing that

24  Lewis joined Sheila's attorney's motion to sever.  (*Id.*)  But Anderson's claim is

25  different than what Respondent makes it out to be.  This claim alleges that Lewis was

26  ineffective for failing to file his own motion to sever, a motion that would have focused

27  on how the joinder specifically prejudiced Anderson.  (*See* Am. Pet. at 50-51 & n.18.)

28  Regarding prejudice, given how the prosecution was able to bolster its case by aligning

1    itself with Sheila, there is a reasonable probability that the verdict would have been

2    different had the trial been severed.  (*Id.* at 51.)

3          Second, as to Anderson's claim that Lewis was ineffective for not adequately

4    challenging Fred's alleged polygraph test results, Respondent again claims that these

5    results, if they existed, could not have been introduced into evidence.  (Resp. Br. at 72.)

6    As noted above, at the time of trial, parties, by stipulation, could enter polygraph test

7    results into evidence.  *Adams*, 53 Cal. App. 3d at 119.  Respondent also asserts that the

8    record shows that the prosecutor provided Anderson with information about the

9    polygraph test (Resp. Br. at 71), though Respondent does not state that the prosecutor

10   disclosed the actual results to trial counsel.  All the record indicates is that trial counsel

11   listened to a tape recording of an alleged polygraph test.  (Prelim. Hearing RT 4-5

12   (1979-03-23).)

13   **R.    This Court should grant habeas relief on Anderson's cumulative error**

14   **claim (Claim Thirty-Eight).**

15         Respondent claims that the "United States Supreme Court has not recognized

16   constitutional protection against cumulative error."  (Resp. Br. at 75.)  But it has.  *See*

17   *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) ("The Supreme Court has clearly

18   established that the combined effect of multiple trial court errors violates due process

19   where it renders the resulting criminal trial fundamentally unfair.") (citing *Chambers v.*

20   *Mississippi*, 410 U.S. 284, 302 (1973) (combined effect of individual errors "denied

21   [Chambers] a trial in accord with traditional and fundamental standards of due process"

22   and "deprived Chambers of a fair trial")).  *See also Montana v. Egelhoff*, 518 U.S. 37,

23   53 (1996) (stating that *Chambers* held that "erroneous evidentiary rulings can, in

24   combination, rise to the level of a due process violation"); *Taylor v. Kentucky*, 436 U.S.

25   478, 487 n. 15 (1978) ("[T]he cumulative effect of the potentially damaging

26   circumstances of this case violated the due process guarantee of fundamental

27   fairness . . . .").

28

1    The California Supreme Court recognized two errors in this case: Sheila's
2  extrajudicial statements were improperly admitted into evidence, as were certain crime-
3  scene photographs. The court also recognized that Judge Moore violated Anderson's
4  rights under California Penal Code section 987. Additionally, the California Supreme
5  Court had "serious doubts" that evidence regarding the unconsummated gas station
6  robbery should have been admitted. Even if this Court determines that any of these
7  errors, or any other errors discussed above, did not mandate relief by themselves, the
8  cumulative effect of the errors discussed in Section III, and any other errors this Court
9  may find, rendered Anderson's 1979 trial fundamentally unfair.

10  ## IV.  CLAIMS ARISING FROM ANDERSON'S 1990-91 PENALTY
11  ## RETRIAL

12  **A.    This Court should grant relief on Anderson's ineffectiveness claims**
13  **(Claim Sixteen).**

14  **1.    This Court should grant relief because Keith Long was ineffective**
15  **in investigating and presenting mitigating evidence.**

16  **a.    Deficient performance**

17  **(1)    Long's social-history investigation fell below**
18  **professional standards.**

19    The parties agree that capital defense attorneys have a duty to investigate a
20  defendant's background. (*See* Pet. Br. at 122 (citing *Williams*, 529 U.S. at 398, and
21  relevant portions of the ABA Standards for Criminal Justice); Resp. Br. at 76 (citing,
22  inter alia, *Williams*, 529 U.S. at 396, and *Wiggins*, 539 U.S. at 521-23).) This duty
23  exists because "of the belief, long held by this society, that defendants who commit
24  criminal acts that are attributable to a disadvantaged background . . . may be less
25  culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302,
26  319 (1989). *See also Wiggins*, 539 U.S. at 535 (petitioner's "troubled history [is]
27  relevant to assessing a defendant's moral culpability").

28

1    Respondent largely does not substantively address whether Long met this duty.

2    He focuses instead on how evidence of Anderson's background would have been

3    unhelpful to his defense (i.e., whether this error was prejudicial), as opposed to whether

4    Long was deficient in his investigation and presentation of Anderson's background.

5    (*See* Resp. Br. at 79 ("Anderson overestimates the value and significance that his social

6    history would potentially have on the capital jury that sentenced him to death.").)  The

7    only substantive comment he makes about whether Long was deficient can be found on

8    page 79 of his brief.  He argues that Anderson only "generally asserts that attorney

9    Long dismissed social history evidence."  (Resp. Br. at 79.)  But Anderson has done

10   much more than that.  He has presented compelling evidence that Long failed to

11   conduct an adequate investigation into Anderson's background even though his experts

12   urged him to do so, because they suspected Anderson was abused as a child.

13   Anderson's supporting evidence comes in the form of declarations submitted by

14   the very experts Long hired and whose advice Long ignored.  Dr. Laurie Poore was

15   primarily tasked with developing social history evidence for trial.  Consistent with

16   established standards at the time of trial, she told Long she would need to interview

17   people who knew Anderson as a child.  (Ex. 105, Dr. Poore Decl., ¶¶ 9-10.)  Dr. Poore

18   frequently reminded Long about the need to conduct this type of investigation.  (*Id.*

19   ¶ 14.)  However, Long never allowed her to "conduct any interviews or travel to the

20   community where [Anderson] had been raised in order to develop evidence that was

21   not directly from the client."  (*Id.* ¶ 20.)  By the time Long fired her, "very little of the

22   work that needed to be done had been accomplished."  (*Id.*)

23   Though Dr. Cecil Whiting was primarily tasked with assessing Anderson's

24   mental health issues, he likewise urged Long to conduct a comprehensive social history

25   investigation so that he (Dr. Whiting) would have an informed foundation for his

26   mental health testing.  (Ex. 19, Dr. Whiting Decl., ¶ 3.)  As noted in Claim One, this

27   foundation is necessary because a mental health expert cannot "develop an accurate

28   profile of the defendant's mental health" if trial counsel does not provide them with

54

basic information relevant to that expert's evaluation.  *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002).  But Long never provided Dr. Whiting with the social history Dr. Whiting requested, and even actively prevented Drs. Whiting and Poore from interviewing Anderson's family members.  (Ex. 19, Dr. Whiting Decl., ¶ 3; Ex. 107, Dr. Whiting Decl., ¶ 13.)  In the end, Anderson, who Dr. Whiting found to "be a marginal personal historian," "was the only source for his physical or social history." (Ex. 19, Dr. Whiting Decl., ¶ 3.)

As the foregoing declarations show, Long purposely ignored his experts' advice and, at times, forbade them from performing their jobs.  Under controlling legal authority, Long's failures amounted to deficient performance for three different reasons.  First, Long failed to fulfill his overarching duty to investigate Anderson's background.  *See Williams*, 529 U.S. 396; *Wiggins*, 539 U.S. at 521-23, 525.  Second, Respondent also failed to provide his experts with the information they required *and* requested.  *See Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) ("counsel must present [the] experts with information relevant to the conclusion of the expert"); *Doe v. Ayers*, 782 F.3d 425, 440 n.19 (9th Cir. 2015) ("Providing psychological experts with the background material necessary for them to competently and correctly evaluate defendants is critical, and when such information is requested by an expert, as here, the failure to provide it constitutes deficient performance.").  Finally, counsel ignored his experts' advice to conduct additional investigations.  *Cf. Bean v. Calderon*, 163 F.3d 1073, 1078-80 (9th Cir.1998) (finding penalty-phase ineffective assistance of counsel where counsel waited 10 months to follow the recommendation of two mental health experts for further neuropsychological testing, because "when testing requested by expert witnesses is not performed, . . . a capital defendant has not received effective penalty phase assistance of counsel"); *Hendricks*, 70 F.3d at 1037 (rejecting a guilt-phase ineffective assistance of counsel claim where counsel followed a psychiatrist's advice to obtain additional psychological evaluation).

1

2

### (2)   Long's mental health investigation also fell short of professional standards.

3      In Respondent's view, "Anderson provides no evidence that there was anything

4  to alert attorney Long that Anderson was suffering from any mental disorder at the time

5  he murdered Coselman and Flanagan to be used as evidence of a mitigating factor."

6  (Resp. Br. at 81.)  Relatedly, he argues "there was nothing to trigger a duty on counsel

7  to make further investigation on Anderson's social history or mental health evidence."

8  (*Id.* at 82.)  He is wrong on both accounts.

9      Long was aware of Anderson's history of head injuries, and this history of head

10 injuries alone would have alerted competent counsel to the need for further

11 investigation and a consultation with the appropriate expert.  *See Rompilla v. Beard*,

12 545 U.S. 374, 391 n.8 (2005); *Frierson v. Woodford*, 463 F.3d  982, 992 (9th Cir. 2006)

13 (counsel deficient for failing to consult a neurologist in light of defendant's multiple

14 head trauma); *see also Caro*, 165 F.3d at 1226 ("Failure to investigate a defendant's

15 organic brain damage or other mental impairments may constitute ineffective assistance

16 of counsel.").

17     Dr. Whiting, moreover, suspected Anderson was brain damaged and repeatedly

18 recommended that Long conduct further testing.  (Ex. 19, Dr. Whiting Decl., ¶¶ 2, 4;

19 *see also* Ex. 107, Dr. Whiting Decl., ¶ 10.)  Long, however, ignored Dr. Whiting's

20 recommendation.  (Ex. 19, Dr. Whiting Decl., ¶ 9.)  Consequently, Anderson never

21 received the mental health evaluation recommended by his defense expert.  This is

22 deficient performance:  "[W]hen counsel is on notice that important mitigation

23 evidence exists, a failure to uncover and present such evidence at the penalty phase

24 represents ineffective assistance of counsel."  *Frierson*, 463 F.3d at 989 (citing

25 *Wiggins*, 539 U.S. at 525).

26     Respondent's attempts to insulate Long's performance are wholly unconvincing.

27 For instance, Respondent argues that Dr. Whiting did not tell Long he suspected brain

28

1  damage.  (Resp. Br. at 81.)  This is not true.  As Dr. Whiting explains in his post-

2  conviction declaration:

> Enough background had been done to reach a preliminary
> assessment of Mr. Anderson.  My preliminary assessment of
> Mr. Anderson was that further testing was necessary to
> determine whether Mr. Anderson suffered from brain damage
> or a recognized thought disorder.  I advised Mr. Long of my
> initial assessment.

9  (Ex. 107, Dr. Whiting Decl., ¶ 11.)  Long, however, never conducted any additional

10  tests.  His failure to do so denied Anderson his right to the effective assistance of

11  counsel.  *See Wiggins*, 539 U.S. at 527-28 ("In light of what [preliminary investigation]

12  actually revealed, [], counsel chose to abandon [the] investigation at an unreasonable

13  juncture, making a fully informed decision with respect to sentencing strategy

14  impossible."); *Bean*, 163 F.3d at1079 ("[W]hen testing requested by expert witnesses is

15  not performed, . . . a capital defendant has not received effective penalty phase

16  assistance of counsel.").

17  Respondent also repeatedly emphasizes Anderson's IQ scores, which placed

18  Anderson in the "low average intelligence" range.  (Resp. Br. at 82.)  It appears that

19  Respondent believes that these scores are some sort of barometer that Anderson was

20  not brain damaged.  (Resp. Br. at 82.)  But these scores actually support Anderson's

21  position.  As Dr. Gregory explains in her post-conviction declaration, Anderson's

22  "average IQ score supports the conclusion that the impairments demonstrated by his

23  performance on the neuropsychological tests are not due to subaverage intellectual

24  ability."  (Ex. 110, Dr. Gregory Decl., ¶ 22.)

25  Respondent also finds it significant that Long reviewed the transcripts from

26  Anderson's 1979 trial and pursued a theory that was consistent with the approach taken

27  in that case.  (Resp. Br. at 83.)  It is unclear, though, why Respondent thinks it is

28  reasonable to pursue the same strategy that another jury had already rejected.

Lastly, to the extent Respondent is suggesting that Long's performance is defensible because it was in accord with his client's wishes (*see* Resp. Br. at 83), the Ninth Circuit has consistently rejected this argument. "[W]hen 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." *Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) (per curiam) (quoting *Stankewitz v. Woodford*, 365 F.3d 706, 719-20 (9th Cir. 2004)). This is true even when a client wants his attorney to pursue a different strategy. *See Porter v. McCollum,* 558 U.S. 30, 39-40 (2009) (a lawyer's duty to conduct a "thorough investigation" is not obviated by a "fatalistic or uncooperative" client) (citing *Rompilla*, 545 U.S. at 381-82); *Karis v. Calderon*, 283 F.3d 1117, 1136 (9th Cir. 2002) (finding counsel had a duty to further investigate evidence of child abuse even though the defendant and his mother were uncooperative). In fact, when a client "'forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial.'" *Hamilton v. Ayers*, 583 F.3d 1100, 1118 (9th Cir. 2000) (quoting *Silva v. Woodford*, 279 F.3d 825, 847 (9th Cir. 2002), and citing *Karis*, 283 F.3d at 1136).

### (3)   Long's decision to pursue a lingering doubt defense is indefensible.

Respondent repeatedly asserts that it was reasonable to pursue a lingering doubt theory, but it was not. Long's decision was illogical. As noted above, another jury had already rejected the lingering doubt theory in a different trial. (Pet. Br. at 131-32.) And the evidence only got worse for Anderson at his penalty retrial: the prosecution added an entire other homicide to the aggravating evidence side of the ledger while Long added no additional evidence to the mitigating side.

Long also failed to execute this illogical sttrategy. First, as shown above, Long's investigation into Anderson's social history and mental health issues was unreasonable. A fortiori, Long's decision to pursue a lingering doubt theory was unreasonable

because "a decision is not a 'strategic' one if not informed." *Bemore v. Chappell*, 788 F.3d 1151, 1174 (9th Cir. 2015).  *See also id.* ("The question under *Strickland* is not only 'whether counsel should have presented a [different] mitigation case,' but also 'whether the investigation supporting [counsel's] decision not to introduce mitigating evidence . . . was *itself reasonable.*'") (quoting *Wiggins*, 539 U.S. at 523).  Second, Long did not adequately pursue his lingering-doubt defense at trial.  (*See* Pet. Br. at 133-34.)  Respondent does not argue otherwise.

> ### (4) Anderson details Long's chronic alcoholism and depression because it offers a partial explanation about what went wrong during this trial.

Around the time of trial, Long was dealing with crippling alcoholism and depression.  (*See* Pet. Br. at 129.)  Respondent, however, wholly discounts that evidence, and intimates that Anderson is arguing that Anderson was deficient *because* he was a depressed alcoholic.  (Resp. Br. at 83.)  But that is not what Anderson is arguing.  The purpose of detailing Long's unfortunate past is to offer an explanation about why his performance fell short of professional standards.

Long's past cannot be ignored.  State bar documents detail the painful battle Long waged privately with depression and alcoholism.  (*See* Ex. 30, State Bar. re: Long.)  Those documents paint a picture of someone who, right around the time of trial, was utterly consumed with his personal failures.

But it was not just depression and alcoholism that affected Long's performance. He also lacked the expertise needed to effectively try this type of case.  By some accounts, Long was an accomplished trial attorney, albeit one who had never represented a defendant at a capital sentencing trial.  A close review of Long's trial investigation and presentation shows that he tried this case like a murder case.  But a penalty trial is fundamentally different from a guilt trial, *Bemore*, 788 F.3d  at 1171, and Long's failure to appreciate this difference is evident by the criticism of his defense team in their post-conviction declarations.  Drs. Whiting and Poore found working with

1    Long to be a maddening experience.  Long simply would not listen to their advice and

2    made virtually no attempt to conduct the proper investigation.  (Ex. 105, Dr. Poore

3    Decl., ¶ 19; Ex. 107, Dr. Whiting Decl., ¶ 13.)  Long's *Keenan* counsel, Michael

4    Kennedy, found Long's work on this case to be so deplorable that he asked the trial

5    judge to remove him from the case because he thought it was unethical to represent

6    Anderson when nothing was being done in mitigation.  (Ex. 114, M. Kennedy Decl.)

7    Just as Long ignored his duty to conduct a reasonable investigation to uncover

8    mitigating evidence, Respondent ignores the damning criticism of those who worked

9    closest with Long on this case.

10                      **b.    Anderson was prejudiced by Long's failures.**

11          Anderson agrees with Respondent that this Court should reweigh the available

12   mitigating evidence against the aggravating evidence.  (Resp. Br. at 78.)  This first

13   requires an analysis of what was presented at trial.  As explained in Anderson's

14   opening brief (Pet. Br. at 135-36), the aggravating evidence consisted of three murders,

15   the two charged murders and the uncharged Mackey homicide.[14]  The only evidence

16   that could be considered to be mitigating evidence was not even offered by Anderson's

17   own lawyer.  On cross-examination, defense witness Myrtle Askew testified that

18   Anderson was a good person.  (Tr2 RT 6218.)

19          The available mitigating evidence was, by contrast, substantial.  It can be divided

20   into two categories: social history evidence and mental health evidence.  Beginning

21   with the former, Respondent argues that Anderson could not have presented a

22   "compelling defense theory" of childhood abuse.  (Resp. Br. at 80.)  In support of his

23   view, he offers the Court a superficial view of Anderson's childhood, highlighting for

24   the Court the more genial aspects of Anderson's life.  (Resp. Br. at 80-81.)  But this is

25   what Respondent does not mention:

26   _____

27          [14]  Respondent does not identify any additional aggravating evidence that could

28   have been presented had Long presented the mitigating evidence discussed below.

- Anderson showed signs of slight retardation in infancy, which may have been related to a traumatic birth that left him with mild deformities.  (Ex. 35, Dr. Globus Decl., at 8 (¶ 6).)

- Anderson was abandoned by his mother at birth and she ignored him throughout childhood, even though she lived right around the corner from him.  (Ex. 35, Dr. Globus Decl., at 8 (¶ 5); Ex. 111, Dr. Jinich Decl., ¶¶ 32-38.)

- Based on several unusual physical traits, Anderson was tormented and abused by his childhood peers.  (Ex. 2, HCDHS Recs, at 28; Ex. 111, Dr. Jinich Decl., ¶¶ 25-29, 71-77.)

- Though there are some reports that Anderson's foster parents cared for him, there are many more reports detailing how he suffered physical abuse and neglect at their hands.  Also, there are several reports that Anderson matured in an environment plagued by poverty and heavy drinking.  (Ex. 111, Dr. Jinich Decl., ¶¶ 44-45, 57-70.)

- As a teenager, Anderson was forced onto the streets immediately after his foster parents died in rapid succession.  (*See* Ex. 2, HCDHS Recs, at 34-36; Ex. 35, Dr. Globus Decl., at 6-26 (¶¶ 32-55); Ex. 111, Dr. Jinich Decl., ¶¶ 79-96.)

Dr. Jinich put it best in his post-conviction declaration:  "By age 17, [Anderson's] life could be summed up as being orphaned from his foster parents, unwanted by his birth parents, hardly known or missed by peers or teachers, frequently rejected by his community, and homeless."  (Ex. 111, Dr. Jinich Decl., ¶ 97.)

The Supreme Court has long recognized that this type of evidence plays an important role in the jury's assessment of a defendant's moral culpability.  *See, e.g.*, *Porter*, 558 U.S. at 41; *Wiggins*, 539 U.S. at 535 (listing cases that recognize the relevance of a defendant's "troubled history" in assessing moral culpability).  Moreover, it has repeatedly found that counsel's failure to investigate and present similar mitigating evidence was prejudicial.  *See*, *e.g.*, *Porter*, 558 U.S. at 42 (failure to investigate and present evidence of abusive childhood prejudiced defendant); *Wiggins*,

61

1   539 U.S. at 536 (defendant was prejudiced by counsel's failure to investigate and

2   present evidence of abuse); *Rompilla*, 545 U.S. at 393 (failure to investigate and present

3   evidence of dysfunctional childhood prejudicial); *Williams v. Taylor*, 529 U.S. 362,

4   396-97 (2000) (finding prejudice despite strong aggravating evidence including history

5   of violent behavior).

6        Regarding the mental health evidence, Respondent surprisingly fails to address

7   whether Anderson was prejudiced by Long's investigation into his mental health issues.

8   (*See* Resp. Br. at 81-83.)  This Court should find that Respondent's failure to address

9   this key issue is tantamount to a concession that Anderson was prejudiced by those

10  failures.  *Ewing*, 638 F.3d at 1230 (the government's "failure to brief the issue results in

11  waiver"); *Bland*, 20 F.3d at 1474 ("To the extent the State had a dispute with the facts

12  as stated in the decision of Court of Appeal, it should have raised it in the district

13  court.").

14       But even if this Court does not find waiver, the evidence speaks for itself and

15  warrants a finding that Anderson was prejudiced by Long's deficient performance.  As

16  noted in Claim One, there is evidence that at the time of the crimes Anderson was brain

17  damaged and was also suffering from a severe mental illness.  (*See* Ex. 35, Dr. Globus

18  Decl., at 34 (¶ 2), 52 (¶ 3) (brain damage and chronic paranoid schizophrenia); Ex. 37,

19  Riley Decl., ¶¶ 21-23 (neurocognitive deficits; severe mental disorder); Ex. 41, Dr.

20  Wicks Decl., ¶ 16 (paranoid schizophrenia); Ex. 108, Dr. Clarren Letter, at 3 (brain

21  damage); Ex. 110, Dr. Gregory Decl., ¶¶ 43, 97 (mild to moderate neurocognitive

22  deficits suggestive of brain damage; major mental disorder); Ex. 112, Dr. Lavid Decl.,

23  ¶¶ 4 ,16 (psychotic disorder due to brain damage, with delusions).)  There is a

24  reasonable probability that the result of this case would have been different had the jury

25  heard that evidence, whether by itself or in combination with the social history

26  evidence.

27       In summary, the jury was completely deprived of information that humanized

28  Anderson, information that gave some much needed perspective to Anderson's actions.

1   For the foregoing reasons, had the jury been able to place Anderson's life history and

2   mental health history "'on the mitigating side of the scale,' and appropriately reduced

3   the ballast on the aggravating side of the scale, there is clearly a reasonable probability"

4   that the jury "'would have struck a different balance.'"  *Porter*, 558 U.S. at 42 (quoting

5   *Wiggins*, 539 U.S. at 537).

6              **2.    Anderson was prejudiced by Long's failure to raise a**

7                   ***Batson/Wheeler* challenge (Claim Nineteen).**

8              Respondent erroneously asserts that Anderson did not make a prima facie

9   showing that the prosecutor's peremptory challenge of prospective juror Nadyne T.

10  violated *Batson v. Kentucky*, 476 U.S. 79, 86 (1986), and *People v. Wheeler*, 22 Cal. 3d

11  258, 271-72 (1978), the California state law analog of *Batson*.  As explained in

12  Anderson's opening brief, prospective juror Nadyne T. was the sole remaining black

13  venireperson at the time she was excused.  (Pet. Br. at 145.)  No black people sat on

14  Anderson's jury; one black person served as alternate juror.  (Tr2 RT 3341, 3347.)

15  Prospective juror Nadyne T. did not hold any absolute views on the death penalty;

16  instead, she believed that death was the appropriate punishment for certain crimes.

17  (Tr2 RT 1114.)  She unequivocally explained that her strong religious beliefs would not

18  affect her ability to be an impartial juror.  (Tr2 RT 1092-97.)  Seemingly, she was an

19  ideal juror.

20             Respondent asserts that this claim fails because Long "could have felt that the

21  prosecutor could provide genuine race-neutral reasons for the excusal."  (Resp. Br. at

22  87 (citing *Anderson II*, 25 Cal. 4th at 569).)  Although the prosecutor never explained

23  why he struck Nadyne T., the California Supreme Court offered two race-neutral

24  reasons for the strike: Nadyne's age and her strong religious beliefs.  *Anderson II*, 25

25  Cal. 4th at 569.  But as Anderson explained in his opening brief (Pet. Br. at 150-51),

26  these two post-hoc justifications are unpersuasive.  Neither Nadyne T.'s strong

27  religious beliefs nor her age made her unqualified to sit on the jury because

28  venirepersons with similarly strong religious beliefs and of a similar age ultimately sat

1    on the jury.  (*See id.*)  Had these reasons been offered by the prosecutor, Anderson

2    would have been able to establish that they were pretext.  *See Miller-El v. Dretke*, 545

3    U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a [minority]

4    panelist applies just as well to an otherwise-similar [non-minority] who is permitted to

5    serve, that is evidence tending to prove purposeful discrimination").

6        Long's own post-hoc rationalization further demonstrates that he did not have a

7    strategic reason for not objecting.  Long's stated reason for his failure to make a

8    *Batson*/*Wheeler* motion—that he wanted "to keep race out of" the case "as much as

9    [he] could"—is illogical given that this case was racially charged from the outset.  (Ex.

10   113, K. Long Decl., ¶ 18.)  Thus, Long's failure to challenge the prosecution's

11   peremptory challenge of Nadyne T. did not result from strategy; rather, it was the result

12   of incompetence.  *See, e.g.*, *Doe v. Ayers*, 782 F.3d 425, 435 (9th Cir. 2015) (finding

13   deficient performance where trial counsel failed to make a *Batson*/*Wheeler* motion).

14       Long's failure to make a *Batson/Wheeler* motion prejudiced Anderson.  To

15   establish that he was prejudiced by Long's inaction, Anderson must demonstrate that

16   there is a reasonable probability that he would have prevailed on a *Batson*/*Wheeler*

17   challenge.  *Carrera v. Ayers*, 699 F.3d 1104, 1107 (9th Cir. 2012) (citing *Strickland*,

18   466 U.S. 692).  As shown above, Long would have prevailed on a *Batson/Wheeler*

19   challenge.  Even if the prosecutor offered the same race-neutral reasons offered by the

20   California Supreme Court, Long could have shown that those reasons were pretext.

21   There is no evidence that the prosecution would have been able to refute the fact that it

22   used its peremptory challenge on Nadyne T. because of her race.

23       **3.**    **Anderson was prejudiced by Long's failure to seek the**

24           **appointment of *Keenan* counsel after the trial court removed**

25           **Kennedy from the case (Claim Seventeen).**

26       Respondent's contention that Anderson is not entitled to habeas relief on this

27   claim is erroneous.  Anderson has identified sufficient evidence in the record before the

28

64

California Supreme Court to demonstrate that Long performed deficiently in failing to obtain a second *Keenan* counsel to replace Michael Kennedy.

As Respondent points out (Resp. Br. at 90), the Ninth Circuit has explained that the appointment of second counsel is necessary in a capital case when "the first lawyer is unable to provide adequate representation [himself]." *Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2004). Such was the situation here. The state-court record establishes that *Keenan* counsel was necessary because Long's inexperience and personal struggle with alcoholism and depression contributed to his inability to adequately lead and conduct a comprehensive investigation of Anderson's social history and mental health. (*See supra* Claim Sixteen.) *Keenan* counsel would have ensured that these tasks, which were necessary for the presentation of an adequate defense at penalty, were completed.

In a further attempt to justify the California Supreme Court's decision, Respondent points out that the American Bar Association's guidelines on which Anderson relies are non-binding. (Resp. Br. at 90.) That is true, but these guidelines are nevertheless important tools in evaluating whether Long's performance was adequate under prevailing professional norms. *Wiggins,* 539 U.S. 524; *Strickland,* 466 U.S. at 688-89. Prevailing professional norms mandated that Long obtain *Keenan* counsel to assist him in litigating the complex case. *See Allen*, 395 F.3d at 998 (indicating that the prevailing professional norm at the time of Anderson's retrial was that two attorneys were necessary to adequately defend a capital defendant). A reasonably competent attorney would not have tried this case by himself, and Long was deficient for doing so. *Id.*

The absence of *Keenan* counsel after the trial court removed Michael Kennedy prejudiced Anderson. Due to the combination of Long's ineffectiveness and the absence of *Keenan* counsel, the jury never heard compelling evidence pertaining to Anderson's social history and mental health issues. Competent *Keenan* counsel would have ensured that this evidence was introduced, and there is a reasonable probability

1    that had the jury heard this evidence, it would not have sentenced Anderson to death.

2    (*See* Ex. 74, Michelle T. Decl., ¶ 4 (juror stating that she would have voted for LWOP

3    had she known about Anderson's mental health impairments and illnesses).)

4        **4.**    **Anderson was prejudiced by Long's inexplicable failure to use his**

5                    **peremptory challenges on obviously biased jurors (Claim**

6                    **Eighteen).**

7           The parties agree that the deferential standard of AEDPA review does not apply

8    to this claim because the California Supreme Court denied the claim on procedural

9    grounds instead of on the merits.  (*See* Pet. Br. at 157-58; Resp. Br. at 91.)  De novo

10   review is therefore appropriate. *Cone*, 556 U.S. at 466-67, 472; *Scott v. Ryan*, 686 F.3d

11   1130, 1133 (9th Cir. 2012).[15]

12          To obtain relief on this claim, Anderson must show that Long performed

13   deficiently by failing to adequately use his peremptory challenges on biased jurors, and

14   that his failures resulted in the empaneling of at least one biased juror.  *Carrera v.*

15   *Ayers*, 670 F.3d  938, 949 (9th Cir. 2011); *Davis v.Woodford*, 384 F.3d 628, 642-43

16   (9th Cir. 2004); *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990).  Anderson has

17   done so.

18          As explained in his opening brief, a close review of the voir dire transcripts

19   reveals that Long allowed the empanelment of a biased jury.  For example, Juror

20   Patrick A. unequivocally told Long during his voir dire examination that anyone who

21   intentionally kills more than one person should be sentenced to death.  (Tr2 RT 1153.)

22   Anderson was convicted of intentionally killing Coselman and Flanagan.  Long asked

23   Juror Barbara B. if she "believe[d] that a person who has been convicted of two

24

25         [15]  In his introductory paragraph to this claim, Respondent argues that the

26   California Supreme Court's decision denying this claim was not unreasonable.  (Resp.
     Br. at 91.)  This reference to § 2254(d) appears to be inadvertent as Respondent later

27   concedes that de novo review is the appropriate standard of review.  Respondent makes
     a similar mistakes elsewhere in this brief.  (*See, e.g.,* Resp. Br. re: Claims Twenty-Two

28   and Twenty-Six.)

murders, both of which are first degree, both of which are premeditated and deliberate, should received (sic) the death penalty?" (Tr2 RT 3731.)  Without hesitation Juror Barbara B. answered, "Yes." (Tr2 RT 3731.)  Patricia A. stated unequivocally during voir dire that the death penalty should be given when someone intentionally and knowingly takes someone else's life. (Tr2 RT 2404.)  Patricia A. also expressed resistance towards accepting the testimony of any mental health experts called as a defense witness. (Tr2 RT 2404.)  Betty M. stated that some ethnic groups are more prone to violence than others. (Tr2 RT 1634-35.)  There was no strategic reason for Long not to use his peremptory challenges on these jurors.  *Carrera*, 670 F.3d at 949.

Respondent provides a detailed summary of the voir dire examinations for all of the empaneled jurors and alternate jurors in his brief in an effort to demonstrate that Anderson's penalty phase retrial jury was impartial. (Res. Br. at 93-111.)  Yet, Respondent's recitation of the voir dire proceedings is unpersuasive.  A close review of those portions of the relevant transcripts reveals that at least jurors Patrick A., Barbara B., Patricia A., and Betty M. were biased.  As Anderson has established that at least one of the empaneled jurors was biased against him, he has shown prejudice under *Strickland*.  *See Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (explaining that a petitioner must show that his counsel's deficient performance during voir dire resulted in the empaneling of a biased juror).

**B.     This Court should grant relief because the trial court denied Anderson his right to be present at a critical stage of the proceedings—the ex parte removal of one of his lawyers (Claims Twenty-Three).**

Despite agreeing with Anderson that this Court reviews this claim de novo because the California Supreme Court denied this claim on procedural grounds (Pet. Br. at 162 (citing *Cone*, 556 U.S. at 466-67); Resp. Br. at 112 (citing *Pirtle*, 313 F.3d at 1167), Respondent argues that "[g]iven the lack of Supreme Court precedent, [Anderson] cannot show that the CSC's denial of this claim on habeas corpus was objectively unreasonable." (Resp. Br. at 114.)  This argument is flawed for two

67

reasons.  First, because this Court reviews this claim de novo, Anderson does not need to demonstrate that the state-court decision was unreasonable.  The restrictions of § 2254(d) do not apply here.  *See Frantz v. Haney*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc) (observing that the limitations of § 2254(d) do not apply when a claim is reviewed de novo).  Second, even though Anderson does not need to satisfy § 2254(d)'s "clearly established federal law requirement" with respect to this claim, *see Hinojosa*, 803 F.3d at 421 n.6, there is, contrary to what Respondent argues, Supreme Court precedent on point:  *Rushen v. Spain*, 464 U.S. 114 (1983), guarantees a criminal defendant the right to personal presence at all critical stages of the trial.  *Id.* at 117; *see also Snyder v. Massachusetts*, 291 U.S. 97, 107-08 (1934) (recognizing the same right), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1, 6 (1964).

Also, Respondent tries to recast this claim as a claim about whether Anderson has a constitutional right to two capital defense attorneys.  (Resp. Br. at 114.)  But that is not how Anderson framed his claim in either his petition or his opening brief.  (*See* Am. Pet. at 217-21; Pet. Br. at 160-65.)  This claim is about Anderson being denied his right to be present at a critical stage of his trial.  (*Id.*)

This Court should also reject Respondent's argument that there is "no evidence or citation to the record to support [Anderson's] conclusory assertion that the trial court ex parte improperly removed Attorney Kennedy from his case."  (Resp. Br. at 114.)  This argument is confusing because Respondent concedes that this hearing occurred.  It appears then that he is disputing how this hearing should be characterized.  An ex parte proceeding is one "[d]one or made at the instance and for the benefit of one party only, and without notice to, or argument by, anyone having an adverse interest; of, relating to, or involving court action taken or received by one party without notice to the other."  Ex Parte, Black's Law Dictionary (10th ed. 2014).  The hearing here was made at Kennedy's request, for the benefit of him, and without notice to, or argument, by Anderson, who had an undeniable interest in the proceeding.  The hearing was therefore, in every sense, ex parte.  *See also Bradley v. Henry*, 428 F.3d 811, 819 (9th

68

1   Cir. 2005) (characterizing a substitution-of-counsel hearing where defendant was not

2   present as an ex parte hearing), *modified on rehearing en banc by* 510 F.3d 1093 (9th

3   Cir. 2007) (en banc).

4        As an en banc panel of the Ninth Circuit explained in *Bradley*, "*Audi alteram*

5   *partem*-hear the other side-is what makes the legal process work in an adversary

6   system." 510 F.3d at 1098. Here, as in *Bradley*, even though Anderson's right to

7   counsel was being directly affected because the trial court was removing an attorney,

8   the trial court did not afford Anderson any opportunity to be heard. Worse, the trial

9   court failed to ensure that these proceedings were transcribed and made no attempt to

10  inform Anderson of what happened. Like the judge in *Bradley*, the judge here "capped

11  his conduct by concealing from [Anderson]" any record "of the closed in-camera

12  proceeding from which [he] had been excluded." *Id.* As the Ninth Circuit did in

13  *Bradley*, this Court should find that Anderson's exclusion from this hearing violated his

14  constitutional rights.

15       This Court should also find that this error prejudiced Anderson. Respondent

16  argues that "Anderson cannot show any prejudice because he has failed to prove that

17  attorney Long needed to obtain full trial assistance from another attorney. *See*

18  *Anderson II*, 25 Cal. 4th at 597-98." (Resp. Br. at 115.) But by demonstrating that

19  Long was ineffective in Claim Sixteen, prejudice is self-evident here.

20  **C.   The trial court's erroneous decision to allow Baros to testify violated**

21  **Anderson's constitutional rights (Claim Twenty-Eight).**

22       Respondent does not appear to dispute that Baros suffered from severe mental

23  illnesses when the unadjudicated Mackey offenses occurred, and that she was still

24  suffering from those illnesses during the penalty retrial. (Tr2 RT 5641, 5673.) Rather,

25  he only disagrees with Anderson about what action the court should have taken in light

26  of her demonstrated mental illness.

27       As explained in Anderson's opening brief, although Long did not move for Baros

28  to undergo a psychiatric evaluation before she was allowed to testify, the trial court

eerd

should have *sua sponte* ordered Baros to undergo a psychiatric evaluation.  At least one federal court has found that such psychiatric evaluations may be appropriate.  *United States. v. Gates*, 10 F.3d 765 (11th Cir. 1993), *overruled on rehearing in part on other grounds*, 20 F.3d 1550 (11th Cir. 1994).  Respondent has not pointed to any authority that would have prevented the trial court from *sua sponte* ordering Baros to submit to a psychiatric evaluation.  (Resp. Br. at 117.)  If Baros had been subjected to a psychiatric evaluation at the direction of the trial court, she would have been found unfit to testify.

Even assuming the trial court did not err by failing to *sua sponte* order Baros to submit to a psychiatric evaluation before she testified, the trial court should have found Baros incompetent to testify because the testimony she provided during the competency hearing was nothing more than a figment of her imagination.  Contrary to Respondent's contention (*see* Resp. Br. at 116), Baros's account of the murder of Jack Mackey was not corroborated in numerous details by the independent evidence.  (*See* Pet. Br. at 178 (charting how several aspects of Baros's account of the Mackey murder were contradicted by numerous undisputed facts).)  Further, Baros was neither a coherent communicator nor was she able to understand her specific duty to give truthful testimony.  (*See* Tr2 RT 6044-53 (Baros falsely testifying before the jury about how Anthony and her triplets died, recounting for them the entire story about the car accident, where her children were buried, and her numerous hospitalizations related to those events); Tr2 RT 6053-54 (Baros emphatically asserting on cross-examination that Anthony and her triplets actually existed); Tr2 RT 6061-62 (Baros testifying that she believed Anderson could telepathically communicate with her).)  Notably, Baros's recollection of the murder of Mackey was inextricably linked to the existence of Anthony—her fictitious son she believed Anderson fathered.  (*See* Pet. Br. at 115-16, 167-68 and Tr2 RT 5880-81, 5893-94 (trial court noting that Anthony likely never existed).)  Therefore, it should have been apparent to the trial court that a rational trier of fact could not find evidence that Baros "accurately perceived and recollected the testimonial events."  *Anderson II*, 25 Cal. 4th at 574.

70

1      The trial court compounded its error in allowing Baros to testify when it denied

2  Long the ability to cross-examine her regarding her mental health history.  At the very

3  least, the trial court should have allowed Long to discredit Baros with evidence of her

4  mental health issues during his cross-examination of her.  The jury was left in the dark

5  regarding Baros's serious mental and emotional problems that she had dealt with for

6  over a decade.  The jury never heard that Baros was taking psychiatric medications at

7  the time of the Mackey murder and at the time of the penalty retrial.  This left the jury

8  unable to properly contextualize Baros's testimony.  By precluding Long from

9  highlighting the undisputed fact that Baros was mentally disturbed, the trial court

10  insulated Baros's testimony from attack.  Had Long been able to cross-examine Baros

11  on her mental history, the jury likely would have discredited her testimony.

12      The trial court's error had a substantial and injurious effect on the jury's verdict

13  for two reasons:  (1) Baros's testimony was the only evidence presented by the

14  prosecution to link Anderson to the unadjudicated Mackey offenses; and (2) Baros

15  stated in her testimony that Anderson confessed to the murders of Coselman and

16  Flanagan.  Long's case-in-chief, as flawed as it was, centered on a lingering doubt

17  theory of defense; thus, Baros's testimony seriously undermined it.

18  **D.    This Court should grant relief because the trial court prevented**

19  **Anderson from calling witnesses in his defense (Claim Thirty).**

20      Despite acknowledging that the California Supreme Court "did not reach the

21  merits" of Anderson's arguments that the application of California Evidence Code

22  section 970 violated his constitutional rights (Resp. Br. at 120-21 (citing *Anderson II*,

23  25 Cal. 4th at 580), Respondent nevertheless analyzes this claim under § 2254(d).

24  (Resp. Br. at 119-22.)  But as already noted, where, as here, a state court denies a claim

25  on procedural grounds, § 2254(d) does not apply and instead a federal court reviews the

26  merits of the claims de novo.  *Cone*, 556 U.S. at 466-67; *Pirtle*, 313 F.3d at 1167.

27      Respondent also mistakenly asserts that Anderson must demonstrate that his trial

28  was rendered fundamentally unfair by the court's ruling.  (Resp. Br. at 120.)  In support

71

of his position, he cites a due process case dealing with the erroneous admission of evidence, *Holley v. Yarborough*, 568 F.3d at 1101. Anderson's claim deals with the erroneous *exclusion* of evidence, an error that affected Anderson's right to present a defense, which is different than the due process rights at issue in *Holley*. To determine whether the error here amounted to a constitutional violation, the proper test is whether, after analyzing the interests affected by the privilege's application, the privilege should have bowed to Anderson's right to present a complete defense. *See Cudjo v. Ayers*, 698 F.3d 752, 764 (9th Cir. 2012) (explaining that *Chambers* held that "this right to defend is "not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process"). For the reasons explained in Anderson's opening brief, the privilege should have yielded here. (Pet. Br. at 181-85.)

Furthermore, in his analysis Respondent largely places the blame on trial counsel's shoulders for failing to present Bruce Baros's testimony, arguing that trial counsel "dropped the matter and never actually called Bruce [Baros] to the stand" even though, in Respondent's view, trial counsel could have done so. (Resp. Br. at 121.) This is an unfair reading of the record because the error here rests with the trial court, not trial counsel. Respondent makes it seem as if the trial court only tentatively ruled that he might allow Bruce to invoke the marriage privilege. The trial court's ruling was not, however, couched in equivocal language: "And the question is, is if [Bruce] claimed the privilege, would he be compelled to testify? My view would be that, under the circumstances of this case, based upon what I've heard in this case, he should not be compelled to testify." (Tr2 RT 5576.) After the trial court issued that firm in limine ruling, there was no point in trial counsel attempting to call Bruce as a witness.

The final question is whether this error had a substantial and injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 623. It did. Respondent's argument to the contrary rests on a flawed premise. He believes that defense investigators Small and Leaman, who did testify, impeached Deborah with the same force that Bruce would have had he testified. (Resp. Br. at 121.) But Bruce, as Deborah's husband, could have

72

impeached Deborah in a dramatically different way than Small and Leaman, two strangers whose testimony the jury may have skeptically viewed given their role on the defense team.  Furthermore, Bruce had an in-depth understanding of Deborah's mental illnesses and how they affected her perception of events, and could have testified about that.  Small and Leaman did not have that knowledge.

**E.     This Court should grant relief because Anderson's sentence is based on false and unreliable evidence (Claim Twenty-Nine).**

In Claim Nine, Anderson asserts a due process violation based on the prosecution's use of false and unreliable evidence.  While there is substantial similarity between this claim and Claim Nine, there is a key difference: This claim has an Eighth Amendment component as well as a due process component.  (*See* Pet. Br. 188-89.)  Respondent, however, addresses only the due process element of this claim.  This Court should deem his silence on the Eighth Amendment issue to be a concession that Anderson's sentence violates the Eighth Amendment.  *Ewing*, 638 F.3d at 1230 (the government's "failure to brief the issue results in waiver"); *Bland*, 20 F.3d at 1474 ("To the extent the State had a dispute with the facts as stated in the decision of Court of Appeal, it should have raised it in the district court.").

Regarding the *Napue* component of the claim, Respondent conflates two separate issues: whether Baros was competent and whether she provided false testimony.  (Resp. Br. at 125.)  The two issues must be taken up separately because even if Baros was competent, she still could have falsely testified.  As for the reasons why Fred's testimony was false, Anderson does not repeat those arguments here, for he explained in detail above in Claim Nine, in his opening brief, and in his amended petition why the prosecutor knew, or should have known, that Fred's testimony was false.

Interestingly, Respondent treats the prejudice component of Anderson's *Napue* component of this claim differently than he did in Claim Nine.  Regarding Claim Nine, Respondent argued that Anderson had to satisfy *Brecht*.  (*See supra* discussion re: Claim Nine.)  Here, he tacitly acknowledges that Anderson need not satisfy *Brecht*.

1   (*See* Resp. Br. at 126 (omitting *Brecht* analysis from prejudice argument and instead

2   citing the correct standard, whether there was a reasonable likelihood that the false

3   testimony affected jury's verdict).)  The mode of analysis used by Respondent here in

4   Claim Twenty-Nine is the correct one.

5   **F.    The trial court committed a constitutional error when it failed to *sua***

6   ***sponte* instruct the jury on the elements of the unadjudicated Jack**

7   **Mackey offenses (Thirty-Six).**

8          As Respondent points out, the jurors were instructed that they could not consider

9   the unadjudicated Jack Mackey offenses as aggravating factors unless they found beyond

10  a reasonable doubt that Anderson committed them.  (Resp. Br. at 127 (citing *Anderson*

11  *II*, 25 Cal. 4th at 587).)  Logically, the jurors would need to be instructed on the

12  elements of the offenses before they could find beyond a reasonable doubt that

13  Anderson committed them.  However, the jury instructions failed to provide the jurors

14  with the element of the offenses.  (*See* Pet. Br. at 191.)  The jurors were thus left to

15  guess as to whether Anderson in fact committed the unadjudicated offenses.

16         For this reason, Anderson's death sentence violates his right to due process and a

17  reliable penalty determination.  *See Sullivan v. Louisiana*, 508 U.S. 275, 277-82 (1993)

18  508 U.S. 277-82 (explaining that due process is violated when jurors are required to

19  find that a defendant committed a crime without adequate explanation as to how the

20  activity may constitute a crime); *Johnson v. Mississippi*, 486 U.S. 578, 585 (1988)

21  (holding that a capital defendant has a constitutional right to a reliable penalty

22  determination).

23         Respondent argues that this claim is subject to harmless error analysis.  But the

24  trial court's failure to instruct on the elements of the unadjudicated offenses constituted

25  a structural error.  *Sullivan*, 508 U.S. at 281.  Even assuming that this claim is subject to

26  harmless error analysis, Anderson is still entitled to relief because the trial court's error

27  had a substantial and injurious effect on the jury's verdict for the reasons set forth in his

28  amended petition.  (*See* Am. Pet. at 282-87.)

74

**G.    The trial court's failure to provide the requested jury instruction regarding the weight of aggravating and mitigating circumstances renders Anderson's sentence unconstitutional (Claim Thirty-Five).**

The proposed instruction was neither duplicative nor redundant; rather, it would have provided clarity as to what the jury would have to find under California law to return a death verdict.  The trial court's error to give the proposed instruction to the jury's had a substantial and injurious effect on the jury's verdict for the reasons set forth in Anderson's amended petition.  (*See* Am. Pet. at 279-82.)

**H.    The consideration of extrinsic evidence by jurors during deliberations constitutes juror misconduct (Claim Twenty-Six).**

The parties agree that § 2254(d) does not apply to this claim because the California Supreme Court denied it exclusively on procedural grounds, and that this Court should therefore review this claim de novo.  (*See* Pet. Br. at 197; Resp. Br. at 133.)

Respondent argues that this Court may not consider the declarations Anderson submitted with his amended petition.  (Resp. Br. at 136.)  He is wrong.  Anderson introduced the declarations to establish that extrinsic evidence was considered by the jurors, not to establish how that evidence affected their deliberations.  (*See* Pet. Br. at 201-02.)  Therefore, this Court may properly consider them.  *See Estrada v. Scribner*, 512 F.3d 1227, 1237 (9th Cir. 2008) (observing that a "long line of precedent distinguishes juror testimony about the consideration of extrinsic evidence, which [this Court] may consider, from juror testimony about the subjective effect of evidence on any of the particular jurors here, which [the Court] may not consider").

These declarations made out a prima facie case of juror misconduct.  The jurors considered information outside of the record, and they were influenced by extraneous evidence.  Specifically, the jurors speculated on what would happen to Anderson after he was sentenced, which is a constitutionally impermissible consideration.  *See Estrada*, 512 F.3d at 1232, 1238 (observing it was misconduct for the jury to discuss

1   during deliberations the need to impose a lengthy sentence to prevent defendant from

2   committing another crime); *cf. Cadwell v. Mississippi*, 472 U.S. 320, 328-29 (1985)

3   (explaining "that it is constitutionally impermissible to rest a death sentence on a

4   determination made by a sentencer who has been led to believe that the responsibility

5   for determining the appropriateness of the defendant's death rests elsewhere").

6   Therefore, despite Respondent's contention to the contrary (Resp. Br. at 135), this case

7   is analogous to *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986), and *Estrada*,

8   512 F.3d at 1232, 1238.  (*See* Pet. Br. at 198-99.)

9          Anderson is entitled to relief on this claim because he has established that the

10  juror misconduct had a substantial and injurious effect on the jury's verdict.  *Fields v.

11  Brown*, 503 F.3d 755, 781 (9th Cir. 2007).  Anderson has demonstrated that the

12  extrinsic evidence was received and improperly considered by the jury.  *Bayramoglu*,

13  806 F.2d at 880, 887.  Anderson has also shown a "rational connection between [the]

14  extrinsic material and the prejudicial jury conclusion."  *Mancuso v. Olivarez*, 292 F.3d

15  939, 953 (9th Cir. 2002).

16  **I.      Other instances of ineffectiveness warrant habeas relief (Claims Twenty**

17  **and Twenty-One).**

18          Claims Twenty and Twenty-One allege the following instances of

19  ineffectiveness: Long failed to request that the jury be instructed as to the elements of

20  the unadjudicated robbery and murder of Mackey; Long failed to challenge the

21  admissibility of Anderson's pretrial statement; Long failed to request that Baros's

22  competency be challenged, even though Dr. Whiting urged him to do so; and Long

23  failed to adequately investigate the prosecution's case.  Anderson and Respondent

24  agree as to the standard of review for these claims.  (Pet. Br. at 203-05; Resp. Br. at

25  138-47.)  For the reasons expressed in Anderson's opening brief and amended petition,

26  he is entitled to relief on these claims.  (Pet. Br. at 203-05; Am. Pet. at 199-207.)

27

28

**J.      Race unconstitutionally motivated the prosecutor's charging decision (Claim Twenty-Two).**

Respondent agrees with Anderson that § 2254(d) does not apply to this claim because the California Supreme Court denied it exclusively on procedural grounds. (Resp. Br. at 147.)  De novo review is therefore appropriate.  *Cone*, 556 U.S. at 466-67, 472; *Scott*, 686 F.3d at 1133.

As explained in Anderson's opening brief, to be granted relief on this claim Anderson has to show:  (1) that the prosecutor's charging decision had a discriminatory effect; and (2) that the charging decision was motivated by race.  (*See* Pet. Br. at 206 (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).)  Anderson has done so here.

The statistical evidence Anderson cites in his amended petition and his opening brief establish that the prosecutor chose to seek the death penalty in Anderson's case because Anderson is black and the victims were white.  (*See* Am. Pet. 208-17; Pet. Br. at 205-11.)  From 1978-90, black defendants, relative to their population, were disproportionately sentenced to death in Riverside County.  (*See* Pet. Br. at 207.) Given the history of pervasive racial discrimination in Riverside County (*see id.* at 207-10), this statistical discrepancy cannot be explained away as merely coincidental. Respondent's suggestion to the contrary is disingenuous.  (*See* Resp. Br. at 149-151.)

Respondent largely relies on the California Supreme Court's decision in *In re Seaton* to support his position.  But *In re Seaton* does not foreclose relief here because *In re Seaton* is not binding authority for this Court.

The aforementioned unlawful conduct infected the integrity of these proceedings and cannot be deemed harmless.  Rather, prejudice is presumed and Anderson is entitled to relief on this claim.  *Sullivan*, 508 U.S. at 281.  Even if Anderson has to satisfy *Brecht*, he can do so.  The unlawful conduct had a substantial and injurious effect or influence on the jury's verdict because the decision to sentence Anderson to

1  death would not have been before the jury if it were not for the unlawful conduct.  (Am.

2  Pet. 208-17.)

3  **K.    This Court should grant relief because Anderson was incompetent**

4  **during the trial (Claim Twenty-Four).**

5  Respondent's opposition to this claim rests on a demonstrably false premise. He

6  asserts that a psychological report of a then-fourteen-year-old Anderson is fatal to this

7  claim.  (Resp. Br. at 153.)  It is unclear how this report is relevant.  The report was

8  made in 1968, more than ten years before the crimes occurred and the initial trial took

9  place, and more than twenty years before Anderson was retried.  Anderson's

10  competency in 1979 and 1990-91 is what is at issue in this capital habeas case, not his

11  competency at age fourteen.

12  **L.    This Court should grant relief because the State unconstitutionally**

13  **excluded minorities from the jury pool (Claim Twenty-Five).**

14  Respondent does not contest that Anderson satisfied the first prong of the three-

15  prong test articulated by the United States Supreme Court in *Duren v. Missouri*, 439

16  U.S. 357, 364 (1979).  He does, however, argue that Anderson has not satisfied the

17  remaining two prongs.  But Anderson has.

18  As to the second prong, which "requires proof, typically statistical data, that the

19  jury pool does not adequately represent the distinctive group in relation to the number

20  of such persons in the community," *United States v. Esquivel*, 88 F.3d 722, 726 (9th

21  Cir. 1996), this circuit now allows lower courts to employ a "comparative disparity"

22  test instead of the "absolute disparity" test that was once mandated.  *See United States*

23  *v. Hernandez-Estrada*, 749 F.3d 1154, 1165 (9th Cir. 2014).  Notably, under the

24  absolute disparity test, the Ninth Circuit "found a 15.4% absolute disparity sufficient to

25  satisfy the second prong of the *Duren* test, and cited with approval another circuit's

26  recognition of the significance of a 14.1% disparity."  *United States v. Rodriguez-Lara*,

27  421 F.3d 932, 944 (9th Cir. 2005), *overruled by Hernandez-Estrada*, 749 F.3d 1154.

28  Here, the disparity demonstrated by Anderson's expert, using the comparative disparity

78

1    test, was 34%, or more than double the figure that the Ninth Circuit found satisfied the

2    absolute disparity test in *Rodriguez-Lara*. *See Anderson II*, 25 Cal. 4th at 567. This

3    Court should find that Anderson has satisfied the second prong of *Duren*.

4          As for the third prong, Anderson's expert, Dr. Butler, opined that the main

5    reason for underrepresentation was the jury commissioner's failure to carry out follow-

6    up procedures with minority groups. (Tr2 CT 970-73, 986-89, 993-94.) The trial court

7    was dissatisfied with Dr. Butler's opinion, which is why Anderson asked for a

8    continuance to further develop the record. The trial court, however, unreasonably

9    denied his request. Thus, to the extent the record is underdeveloped now, the trial court

10   is to blame, not Anderson. This Court should grant an evidentiary hearing to allow

11   Anderson to demonstrate "that this underrepresentation is due to systematic exclusion

12   of the group in the jury-selection process." *Duren*, 439 U.S. at 364.

13   **M.   This Court should grant habeas relief because Anderson and his**

14         **attorney were not present at a proceeding where the trial court took**

15         **evidence to determine whether Anderson should be shackled, and also**

16         **because Anderson was shackled (Claim Twenty-Seven).**

17         This claim presents two different theories for habeas relief. The first theory

18   relates to the ex parte hearing the trial court held to determine whether Anderson should

19   be shackled. Neither Anderson nor his attorney was present. Anderson had a right to

20   be personally present at that hearing, *see United States v. Gagnon*, 470 U.S. 522, 526-

21   27 (1985) (citing *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)), as well as a

22   right to have his attorney present, *see Chapman v. California* 386 U.S. 18, 23 n.8

23   (1967). Respondent fails to dispute Anderson's allegations. (Resp. Br. at 157-59.)

24   This Court should deem his silence to be a concession that the exclusion of Anderson

25   and his trial counsel from this hearing amounted to constitutional error. *Ewing*, 638

26   F.3d at 1230 (the government's "failure to brief the issue results in waiver"); *Bland*, 20

27   F.3d at 1474 ("To the extent the State had a dispute with the facts as stated in the

28   decision of Court of Appeal, it should have raised it in the district court.").

On the question of prejudice, the denial of counsel from a critical stage can never be harmless.  *See Chapman*, 386 U.S. at 23 n.8 (denial of right to counsel is structural error); *Musladin v. Lamarque*, 555 F.3d 830, 838 (9th Cir. 2009) (explaining that "one circumstance warranting the presumption [of prejudice] is the 'complete denial of counsel,' that is, when 'counsel[is] either totally absent, or prevented from assisting the accused during a critical stage of the proceeding'") (quoting *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984)).  Though the United States Supreme Court has never explicitly determined whether a violation of a defendant's right to be personally present at trial is structural error, in two different cases the Court has intimated that it is.  In reviewing the contours of this right, which originated from *Snyder*, 291 U.S. 97, the Court has twice cited to *Faretta v. California,* 422 U.S. 806, 819 (1975).  *See Gagnon*, 470 U.S. at 526; *Rushen v. Spain*, 464 U.S. 114, 138-39 (1983).  A violation of the right to self-representation recognized in *Faretta* is structural and is therefore not susceptible to harmless error review.  *Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008) (en banc).  The Supreme Court's citation to *Faretta* in *Gagnon* and *Rushen* strongly suggests that the Court considers a violation of *Snyder* to be a structural error.

The second theory for relief presented by this claim relates to the unjustified shackling itself.  Interestingly, Respondent makes no attempt to argue that the shackling was justified.  Instead, he argues that Anderson was not prejudiced by it, pointing out that there is no evidence that any jurors saw Anderson shackled.  (Resp. Br. at 158.)  But he overlooks a different way Anderson was prejudiced by the shackling: the restraints caused Anderson pain and may have impeded his ability to communicate with counsel.  (Am. Pet. at 241-42.)  Respondent makes no mention of these allegations.  (Resp. Br. at 158-59.)  Accordingly, he was waived any argument that Anderson was not prejudiced for these reasons.  *Ewing*, 638 F.3d at 1230 (the government's "failure to brief the issue results in waiver"); *Bland*, 20 F.3d at 1474 ("To the extent the State had a dispute with the facts as stated in the decision of Court of Appeal, it should have raised it in the district court.").

80

**N.    The jury's consideration of the unadjudicated Jack Mackey offenses violated Anderson's constitutional rights (Claim Thirty-One).**

Respondent is wrong that the trial court properly admitted evidence of the unadjudicated robbery and murder of Jack Mackey.  The allegation that Anderson robbed and murdered Jack Mackey was nothing more than a fictitious story told by a delusional, mentally ill person.  (*See* Pet Br. at 166-180, 188-89 and *supra* Claim Twenty-Eight.)  By allowing the jury to consider the Jack Mackey murder in aggravation, the trial court rendered Anderson's penalty retrial fundamentally unfair. *Woodson v. North Carolina*, 428 U.S.  280, 305 (1976); *Johnson v. Mississippi*, 486 U.S. 578, 586 (1988).

**O.    This Court should grant relief on Anderson's *Brady* claim (Claim Thirty-Two).**

For the same reasons that Respondent's opposition fails to convincingly refute Anderson's *Brady* claim from his 1979 trial, Respondent's opposition fails to convincingly refute Anderson's *Brady* claim from his penalty retrial.

**P.    This Court should grant relief because the trial court erroneously admitted prejudicial photographs (Claim Thirty-Three).**

The erroneous admission of photographs can render a trial fundamentally unfair. *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Villafuerte v. Lewis*, 75 F.3d 1330, 1343 (9th Cir. 1996) *on reh'g sub nom. Villafuerte v. Stewart*, 111 F.3d 616 (9th Cir. 1997).  As detailed in Anderson's amended petition, the introduction of several photographs at penalty rendered his trial fundamentally unfair.  (Am. Pet. at 272-75.) Respondent's opposition fails to convincingly argue otherwise.  (Resp. Br. at 163-66.)

**Q.    This Court should grant relief on Anderson's *Ake* claim (Claim Thirty-Four).**

As Respondent did with Anderson's guilt-phase *Ake* claim, Respondent asserts that Anderson's penalty-phase *Ake* claim fails simply by virtue of the fact that trial counsel hired a mental health expert and there is no evidence that the trial court denied

1   any of counsel's funding requests for a mental health expert.  (Resp. Br. at 168.)  But as

2   explained above and in Anderson's amended petition, *Ake* demands more than just

3   "access to a competent psychiatrist."  (Am. Pet. at 139.)  *Ake* guarantees defendants an

4   "*appropriate* examination," one that will "'assist in evaluation, preparation, and

5   presentation of the defense.'"  (*Id.* at 140 (quoting *Ake*, 470 U.S. at 83).)

6   The *Ake* violation here was even more egregious than the one at Anderson's

7   1979 trial because here the trial court knew about Long's failures.  Both Kennedy and

8   Dr. Whiting notified the court of Long's ineffectiveness.  (*See supra* Claim Twenty-

9   Three; Ex. 19, Dr. Whiting Decl., ¶ 1(c).)  Under these circumstances, the court had a

10  duty to inquire as to whether Anderson had received what he was entitled to under the

11  Due Process Clause:  Access to a mental health expert who would provide him with an

12  appropriate examination that would assist in evaluation, preparation, and presentation

13  of the defense.  *Ake*, 470 U.S. at 83.

14  **R.   Anderson has shown that multiple instructional errors at penalty**

15  **entitle him to habeas relief (Claim Thirty-Seven).**

16  Respondent is wrong that Anderson is not entitled to relief on his claim

17  concerning the trial court's failure to instruct the jury on the sufficiency of

18  circumstantial evidence.  As explained in the opening brief, the prosecution relied

19  heavily on circumstantial evidence to establish that Anderson committed the crimes

20  against Coselman and Flanagan as well as the unadjudicated Mackey offenses.  (*See*

21  Pet. Br. at 217.)   Therefore, Anderson had the right to have the jury instructed in

22  accordance with CALJIC 2.01.  *Mills v. Maryland*, 486 U.S. 376, 374 (1988).  The trial

23  court's failure to instruct the jury had a substantial and injurious effect on the jury's

24  verdict.  (Am. Pet. 287-98.)

25  Respondent also contends that habeas relief is not available due to the following

26  trial court errors: (1) the trial court failed to properly instruct the jury on lingering

27  doubt; (2) the trial court failed to provide the jury with information relating to the

28  relative culpability and sentence of Sheila Anders; (3) the trial court failed to instruct

the jury that it had to return a unanimous verdict; and (4) the trial court failed to instruct the jury that several statutory factors could only be considered as mitigating. Respondent's contention is erroneous.  Regarding the first error, the jurors notified the court that they were confused over the lingering doubt instructions, and the trial court's solution to that problem was to refer the jurors back to the same confusing instruction about whether they could consider lingering doubt as to both the capital crimes and the Mackey crimes.  (*See* Pet. Br. at 217 (citing Tr2 CT 698; Tr2 RT 6727).)  Regarding the second error, the proposition that a criminal defendant is constitutionally entitled to introduce evidence of the disposition of charges against a codefendant is not a novel concept.  *See Parker v. Duggar*, 498 U.S. 308, 315-16 (1991) (recognized that jurors must be allowed to consider the extent and degree of punishment inflicted on co-defendants as a mitigating factor); *see also Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (explaining that a jury may not be precluded from considering any relevant mitigating evidence offered by the defendant as basis for a sentence).  Regarding the third error, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), mandated that the trial court instruct the jury to return a unanimous verdict. Finally, regarding the fourth error, the trial court's failure to inform the jury that certain factors could only be considered as factors in mitigation violated *Jones v. United States*, 527 U.S. 373, 381 (1999).

**S.    This Court should grant habeas relief on Anderson's cumulative error claim (Claim Thirty-Eight).**

Again, Respondent asserts that there is no clearly established federal law to support a cumulative error claim.  (Resp. Br. at 180 ("The United States Supreme Court has not recognized constitutional protection against cumulative error.").)  Again, he is wrong.  *See Chambers v Mississippi*, 410 U.S. 284, 302-03 (1973) (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"); *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) (stating that *Chambers* held that "erroneous

83

1  evidentiary rulings can, in combination, rise to the level of a due process violation”);

2  *Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978) (“[T]he cumulative effect of the

3  potentially damaging circumstances of this case violated the due process guarantee of

4  fundamental fairness . . . .”); *see also Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir.

5  2007) (“The Supreme Court has clearly established that the combined effect of multiple

6  trial court errors violates due process where it renders the resulting criminal trial

7  fundamentally unfair.”)

8      Under clearly established federal law, the errors in this case—both those that

9  occurred at guilt and at penalty—mandate habeas relief.  These errors include those

10  errors explicitly recognized by the California Supreme Court, and those errors

11  discussed at length in this brief, in Anderson’s opening brief, and his amended petition.

12  Even if this Court determines that each of these errors “considered individually would

13  not require reversal, the cumulative impact of these errors rendered Anderson’s trial

14  fundamentally unfair.”  *Parle*, 505 F.3d at 928.

15  **T.     This Court should grant relief on Anderson’s systemic challenges to the**

16          **death penalty (Claim Thirty-Seven).**

17      To preserve his multiple “systemic” challenges to California’s death penalty

18  statute, Anderson included these challenges in his opening brief.  Anderson maintains

19  that each challenge is based on a violation of clearly established federal law and that

20  the California Supreme Court’s decisions denying these challenges is both contrary to

21  clearly established federal law and objectively unreasonable.

22

23

24

25

26

27

28

# V.  CONCLUSION

For the reasons set forth in this brief, Anderson's opening brief, his amended petition, and all other records before this Court, Anderson has demonstrated that 28 U.S.C. § 2254(d) does not bar relief on any of his claims and that he is entitled to habeas relief.  Because Anderson has demonstrated colorable claims for relief and diligence in pursuing factual development in state court, he is entitled to an evidentiary hearing on claims where factual disputes remain.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED:  December 16, 2015          By:  */s/ Michael D. Weinstein*
                                       MICHAEL D. WEINSTEIN
                                       JELANI J. LINDSEY
                                       Deputy Federal Public Defenders

                                       Counsel for Petitioner
                                       JAMES P. ANDERSON

85